*In re* MARRIAGE OF GRACE E. JEROME, Petitioner-Appellee, and TERRY T. MARTINEZ, Respondent-Appellant.

Fifth District   No. 5—92—0808

Opinion filed January 3, 1994.

Barbara Crowder, of Crowder & Taliana, of Edwardsville, for appellant.

Julie Keehner Katz, of Belleville, for appellee.

JUSTICE MAAG delivered the opinion of the court:

Respondent, Terry Martinez, appeals from a judgment of dissolution of marriage entered on June 12, 1992, dissolving the bonds of matrimony between the respondent and the petitioner, Grace Jerome. On appeal, respondent raises the following issues:

(1) Whether the trial court committed reversible error for failing to bifurcate the dissolution proceedings and more particularly for failing to hear grounds first;

(2) Whether the trial court abused its discretion in finding that grounds of extreme and repeated mental cruelty had been established;

(3) Whether the trial court abused its discretion in the distribution of marital property;

(4) Whether the trial court erred in finding that respondent had dissipated marital assets in the sum of $2,500 and awarding petitioner a judgment against respondent for the total sum; and

(5) Whether the trial court erred in awarding petitioner the sole custody of the minor children of the parties.

The parties were married on August 8, 1981, in Narragansett, Rhode Island. It was the second marriage for respondent and the first marriage for petitioner. Two children were born to the parties, Laura and Daniel, who were respectively eight and six at the time of the dissolution. Respondent also had two grown daughters from his previous marriage.

In 1991, petitioner was employed part-time teaching at St. Louis College of Pharmacy and was attending law school. Respondent was a tenured professor teaching at St. Louis College of Pharmacy. Sometime during 1991 the respondent became ill, and he did not work from November 26, 1991, through April 3, 1992. During the period of time when respondent did not work, he saw 22 doctors and had numerous tests.

On November 30, 1991, the petitioner took the minor children and vacated the marital domicile of the parties. Petitioner and the children spent approximately one week in a hotel, then they went to the State of New York to petitioner's parents' home. The children were not in school from the first week of December until school resumed in January 1992 after the Christmas break.

On December 9, 1991, the petitioner filed in the circuit court of St. Clair County a petition to dissolve her marriage to the respondent alleging grounds of extreme and repeated mental cruelty and, among

other things, sought the sole custody of the parties' children. On the same date, petitioner also filed a petition for temporary custody, temporary support, exclusive control of the premises, and other related relief. In her temporary petition, petitioner alleged that respondent had, on December 2, 1991, cashed in the parties' money market account and certificates of deposit in the sum of $17,000 and was withholding all the funds from petitioner.

On December 18, 1991, respondent filed a petition for temporary relief and a petition for an order of protection. In his petition for order of protection, respondent alleged that petitioner removed the minor children from the marital residence, school, and the State of Illinois without his permission and, thereby, had restricted his access to the children. In his petition for temporary relief respondent sought the temporary custody of the children or, in the alternative, liberal visitation, and the exclusive possession of the marital domicile for his "physical and mental well being," as he was undergoing treatment for a medical condition which had temporarily placed upon respondent physical limitations.

On December 19, 1991, apparently by agreement of the parties, the court entered an order which provided that both parties consented to the exchange of medical and psychiatric records and further ordered each of the parties to undergo psychiatric evaluation and treatment through a psychiatrist of their choice. Petitioner was ordered to return the children to Illinois at her expense, to obtain an apartment in St. Clair County, and to reenroll the children in the school they had attended. Respondent was awarded the exclusive possession of the marital domicile, and the parties were granted the joint temporary custody of the children with each party being entitled to the "maximum involvement and participation in the raising and development of the children." Both parties were enjoined from the dissipation of marital assets for the expenditure of items which were not necessities of life or normal expenses in the ordinary and regular course of business. Respondent was granted visitation each Friday from 5 p.m. to Saturday at 7 p.m., each Monday after school until Tuesday morning, each Wednesday after school to take to school on Thursday, and such other times as petitioner was unavailable to personally care for the children. Petitioner was to have the children at all other times and at any time respondent was unable to personally care for the children.

On December 29, 1991, petitioner with her parents escorted and returned the minor children of the parties to the respondent at the marital domicile. Respondent's parents were present also, and an altercation took place. Respondent had petitioner and her parents ar-

rested for disorderly conduct alleging in the criminal complaints that petitioner and both of her parents had called him a "dirty bastard." The petitioner and her parents were ultimately acquitted of all charges after a hearing in April 1992.

On February 3, 1992, during a pretrial conference the parties jointly asked the court to appoint a psychologist to evaluate the parties regarding custody of the children. Pursuant to section 605 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1991, ch. 40, par. 101 *et seq.* (now 750 ILCS 5/101 *et seq.* (West 1992))), the court appointed Daniel Cuneo, Ph.D., to evaluate the parties and the children, if necessary.

Subsequent to the events and arrests of December 29, 1991, the court entered a detailed order on February 11, 1992, setting forth with great specificity the items of nonmarital personal property that petitioner could remove from the marital domicile as well as the exact time petitioner could access the marital domicile and the number and sex of the persons petitioner could employ to assist. The petitioner was also granted leave to remove the two family dogs from the marital home to board them with a veterinarian to care for them until such time as a new home could be found.

An evidentiary hearing on the petitions for temporary relief was held on March 30, 1992. The court, based upon its independent evaluation of the record, readopted the terms of the order entered December 19, 1991, regarding custody and visitation.

Dr. Cuneo filed on May 19, 1992, his written report to the court. After interviewing both parties, testing both parties, and interviewing the children, Dr. Cuneo concluded that it would be in the best interests of the children to award custody to petitioner as she was found, in Dr. Cuneo's opinion, to be the more psychologically stable parent. In his report, Dr. Cuneo states that petitioner claimed that she left respondent as respondent was obsessed with having a life-threatening illness despite numerous physicians stating that he had no major physical difficulties. Further, respondent refused to seek psychiatric help despite it being recommended by his treating physicians. Petitioner claimed that respondent's behavior had became increasingly bizarre. Petitioner vacated the marital domicile in late November 1991 hoping that respondent would seek psychiatric help, and petitioner was fearful that respondent would hide the children as he had attempted to do with one of his daughters from his first marriage. The report recites respondent's claim that petitioner had abandoned him when he was near death and that petitioner always put her career before respondent and the children. Respondent insisted that he was the parent that

provided the primary care for the children, and respondent expressed a belief that petitioner, if she was granted sole custody, would push the children aside.

Based upon his testing and evaluations, it was Dr. Cuneo's express opinion that petitioner had no major psychological difficulties which would impair her parenting functions. Respondent, however, was found to have difficulties that might impair his parenting abilities such as his hypochondrical obsession with death and illness. Repeatedly throughout his interview session, respondent spoke to Dr. Cuneo of his illness. Respondent was convinced that the illness was life threatening, and he was obsessed with confirming that he had, in fact, a major illness. In his quest for confirmation, respondent related to Dr. Cuneo how he had self-cleansed his scrotum with alcohol and aspirated with a small needle fluid from his epididymis which he sent to a lab for testing. Various doctors rendered various opinions of the type of illness that respondent had. One doctor determined that respondent suffers from an obsessive-compulsive personality disorder and another opined that respondent suffers from an adjustment disorder with mixed emotional features.

Respondent reported to Dr. Cuneo that the only reason that he was seeing a psychiatrist was in an attempt to guard himself against someone labeling him as "crazy." Respondent stated his belief that at the root of all his difficulties was the fact that petitioner gave him a sexually transmitted disease. In Dr. Cuneo's opinion such a belief allows respondent to project all blame for all problems on petitioner since she rejected him. Further, Dr. Cuneo felt that respondent's obsession with death and physical illness hindered his ability to provide for the physical needs of the children.

Dr. Cuneo found that both children were confused by respondent's actions as respondent has turned himself into an invalid. Laura related that respondent told her that when he dies she will have to be a mother to Daniel. Both children reported to Dr. Cuneo respondent's conversations regarding his own imminent death and coffins. Both children expressed many fears of death and abandonment and stated that they wanted to live with their mother even during the interviews in which respondent brought them to see Dr. Cuneo. With respect to the issue of joint custody, Dr. Cuneo opined that joint custody would not work as the parties are unable to work together in any type of decision making for the children.

On May 29, 1992, a trial of this matter was held. At trial, petitioner called as her first witness Dr. Cuneo, who testified consistent with his written report. Dr. Cuneo admitted that he had not seen the

respondent since February and respondent, at the time of trial, physically appeared to have greatly improved.

For her second witness, petitioner called Cheri Schutzenhofer. Mrs. Schutzenhofer was Laura's kindergarten teacher and testified that petitioner was often at school and concerned about the child. The witness related that she usually saw petitioner twice a month but had never met respondent. Since Laura's promotion from kindergarten, Mrs. Schutzenhofer stated that she has observed petitioner with both children at Khoury league games and various other places in the Fairview Heights area. She also testified that petitioner had volunteered to read stories to students at the school library during the school year, and this led to regular contact with petitioner. Mrs. Schutzenhofer described petitioner as having a good relationship with her children.

The third witness to testify for petitioner was Deborah Bushey, the social worker at the elementary school attended by the parties' children. Ms. Bushey related some of the problems Laura was experiencing prior to and after her parents' separation and the petitioner's involvement in the child's counseling. Ms. Bushey related that near the end of Laura's counseling, shortly prior to the trial, respondent requested and attended one conference to discuss Laura's counseling.

The next witness called by petitioner on the first day of trial was Robert E. Smith, the dean of the St. Louis College of Pharmacy. Mr. Smith testified that he was acquainted with both parties and, further, testified to their employment at St. Louis College of Pharmacy, respondent's illness, the local average salary for a pharmacist, and the local average salary for a full-time pharmacologist in a teaching position.

The last witness to testify on May 29, 1992, was Dr. Olga De-Torres, a clinical pharmacist employed at Mount Sinai Medical Center in Chicago. Dr. DeTorres testified that she has known petitioner for 11 years and respondent for 10 years. She and petitioner frequently exchanged letters, phone calls, and visits. Dr. DeTorres stated that she visited the parties about once a year. Occasionally the parties and the children would visit her in Chicago. Dr. DeTorres related that petitioner had a "fine, normal, maternal relationship with her little ones" and that respondent also had a fine relationship with the children. Dr. DeTorres recounted a telephone call that she had received from respondent in the winter of 1992. During the phone call, respondent accused petitioner of being unfaithful, contracting a venereal disease, giving it to respondent, and thereby causing respondent's illness.

On Monday, June 1, 1992, the trial resumed and petitioner was the first witness. Petitioner testified at length regarding respondent's illness and its affect on her and the children. Petitioner testified extensively regarding the lists and values of marital and nonmarital property that she had prepared. She told the court of her preference to be awarded the sole custody of the children and alternate-weekend visitation for respondent. She testified that respondent, over the last two years of the marriage, had become an unfit parent. To support the claim of unfitness, petitioner cited respondent's obsession with his own health as well as his obsession with the children's health and well-being.

Petitioner described incidents that occurred during the marriage in which respondent would become frantic if the children were ill or injured. In 1988 Daniel fell, and while respondent was transporting the child to the doctor, he made a left-hand turn and the vehicle he was driving was struck by an oncoming car. In 1987 when Laura was in kindergarten, she was struck in the eye by another child resulting in her eye being red. Although the blow to Laura did not result in a black eye or serious injury, respondent wanted Laura removed from her school because of the incident.

Petitioner also reported examples of respondent's extreme overprotectiveness, which caused the children distress. According to petitioner, minor ailments that the children acquired such as sniffles resulted in respondent taking the children to the doctor and insisting on throat cultures. Respondent objected to Daniel playing soccer during the pendency of the divorce, and after one of the soccer games, respondent requested that petitioner take out her stethoscope and listen to Daniel's chest as respondent claimed the boy was complaining of chest pains. Petitioner then explained that Daniel was breathing hard because he had just played soccer for an hour. Because petitioner refused to perform an examination on Daniel, respondent took the child to the doctor a week later to have Daniel examined for the prior chest pains and shortness of breath.

Petitioner also insisted that respondent stifled the children's ability to participate. Laura, at eight, was invited to a roller skating party, and because respondent felt that the activity was dangerous, he insisted on staying with the child during the entire party. This upset the child. Respondent objected to Daniel playing T-ball and continually supervised and instructed the child during the game by walking into the batter's box, following the child around the bases, and standing behind home plate while the child was catching.

Petitioner disputed respondent's claim that he was the primary caretaker of the children during the marriage. Petitioner testified that during the marriage she did all the physical things related to the children's primary care. She prepared their dinner, attended all teacher conferences, helped with homework, prepared lunches, and purchased all of their clothing, toys, Christmas gifts, and presents. Petitioner said that she took the children to the majority of their extracurricular activities, gave them baths, and took them for their haircuts.

Petitioner described the children as being "shell shocked" during the five to six months of temporary joint custody. During the period of temporary joint custody, the children received one bath each at respondent's home and were sent to school by respondent inappropriately dressed. Petitioner expressed her belief that joint custody would not work because respondent "demands, badgers, and insists on having his way."

Petitioner testified that one of the primary reasons she left the marital domicile was because respondent had invited his parents into the marital residence over her objections. Respondent believed that he needed to be cared for by his parents. Respondent's mother accused petitioner of making respondent ill and followed petitioner around the house for 20 to 30 minutes at a time yelling and shouting at petitioner in front of the children. Petitioner indicated to respondent that she could not live in the marital residence while his mother was present. Petitioner testified that she asked respondent to ask his mother to leave and also requested respondent to see a psychiatrist. Respondent refused both of petitioner's requests, and petitioner left the marital domicile with the children because she found life in the marital domicile "intolerable." Petitioner stayed with the children in a hotel room for a week but was forced to go to New York to her parents' home because she had limited funds. This was due to respondent's withdrawing $17,000 from their savings.

Following petitioner's testimony on issues of custody, property, child support, and why she left the marital residence, a brief grounds hearing was held. Petitioner testified that respondent had been guilty of extreme and repeated mental cruelty. This alleged cruelty consisted of respondent accusing petitioner of being unfaithful, infecting him with a disease, and moving his parents into the marital domicile. Petitioner stated that respondent's conduct caused her to become upset and emotionally anguished and that she had done nothing to provoke his conduct.

Respondent also testified on June 1, 1992. He related that in November of 1991 he was in terrible physical shape. He had swollen lymph nodes under his arm and in the region near his groin. Respondent related that he suffered with a very sore throat and experienced intense pain all down his legs including his feet. Respondent admitted to doing research in an attempt to determine the cause of his illness and repeatedly requested of the numerous doctors he saw to perform examinations and tests in addition to the examinations that they ordered. Respondent related that his health continued to deteriorate during December of 1991. By January of 1992 he barely was able to walk. By February 1992, when he saw Dr. Cuneo, respondent stated that he was getting a bit better. Respondent admitted aspirating his scrotum with a needle because the doctors refused to comply with his request to do so.

Respondent testified that prior to his illness in 1991 he was providing for the care of the children. He stated that he would come home early from work to take care of them and fix their supper. He dropped them off at school or before they went to school at the baby-sitters. If the children were sick, he took them to his place of employment or stayed home with them. Respondent explained that petitioner would not miss a class when the children were sick, and he denied being obsessive about the children's care or well-being.

Respondent called as his only witness Doris Shermer, a neighbor of the parties. Ms. Shermer testified that she had provided child care for the parties from four months prior to the birth of Daniel until approximately four months after his birth. Ms. Shermer testified that it was usually respondent who picked up the children from her home and that to her knowledge respondent always conducted himself in an appropriate, loving, and affectionate manner toward his children. During her testimony, Ms. Shermer also stated that she had never observed inappropriate activities or behavior between petitioner and the children.

After Ms. Shermer testified, respondent again testified. Respondent related that he had prepared a listing of all the money, including the parties' $17,286.48 savings. He admitted spending the savings after the petitioner left the marital domicile. Respondent testified that at the time petitioner left, he did not have safe, reliable transportation, so he purchased an automobile for $9,102.10 and paid off the AT & T Universal card that petitioner had charged $2,428 on. He testified that "virtually all of the $17,000 was gone by the end of December." Respondent's written summary entered as an exhibit is as follows:

| | |
|---|---|
| $500.00 | Living expenses during December 1991 |
| $500.00 | Given to petitioner at her request |
| $9,102.10 | Used to purchase a 1991 Dodge Spirit |
| $2,500.00 | Expended on attorney fees |
| $500.00 | Spent on lab fees, doctors fees, and living expenses |
| $2,428.55 | Payment on the AT & T Universal Credit Card |
| $13.75 | Caseyville Water |
| $49.13 | Illinois Bell |
| $121.00 | Society of Toxicologists |
| $152.00 | Illinois Power |
| $5.00 | Health Medical Group |
| $80.00 | Vanholm Health Care |
| $30.85 | Continental Cable |
| $78.24 | Overhead Door |
| $24.00 | Group Health Plan |
| $1,000.00 | Living and health expenses for January and February |
| $75.00 | Central Bank—fee for drilling into safe deposit bank |
| $25.00 | Membership in Sam's Wholesale Club |
| $11.94 | Photo-developing cost for photos showing condition of house |
| $13.18 | Food |
| $10.80 | Scott Base Exchange for household maintenance |
| $13.75 | Postage |
| $5.80 | Postage |
| $14.19 | Commissary |
| $2.81 | Postage |
| $38.58 | Commissary |
| $56.39 | Locksmith for key |
| $2.26 | Villa Lighting |
| $14.64 | Gasoline |
| $8.50 | Christmas for Laura |
| $13.35 | Base Exchange |
| $14.89 | Carter Plumbing for septic treatment |
| $5.85 | Dog food |
| $10.00 | Gasoline |
| $30.00 | Danny's Christmas |
| $60.00 | Food |

| | |
|---|---|
| $217.74 | Dr. Leonard Naeger—fee lecturing for respondent during illness |
| $391.51 | In receipts from December 31, 1991, to January 16, 1992 |
| $352.71 | In receipts from December 21, 1991, through February 6, 1992 |
| $363.56 | In receipts through February 18, 1992 |
| $18,837.07 | Total |

Respondent asked the trial court to award him sole or joint custody of the children and testified that he believed he could cooperate with the petitioner sufficiently to benefit the children if joint custody was granted. Respondent emphasized that he had been cooperating with petitioner for 10 years or longer and had done everything possible to accommodate her during the marriage. Respondent told the trial court that it was his intention to continue therapy until he felt completely well which he stated "is going to be in a very short time."

Under cross-examination, respondent testified that during the first three weeks of December, he could barely get out of bed except to go to the bathroom. Respondent admitted that on December 7, 1991, he got out of bed for one or two hours and purchased a new automobile although he already had two automobiles in his possession. Respondent admitted that during December 1991 he received his regular salary of approximately $4,000.

Respondent also admitted that in April 1992 he asked that the children be brought into court to testify against their mother, the petitioner, on the disorderly conduct charges he had brought against petitioner and her parents. During a hospital stay from January 10 through January 16, respondent admitted that he failed to inform petitioner of his hospitalization, and he also admitted that pursuant to the temporary custody arrangement the children should have been with petitioner during his hospitalization. Respondent testified that he failed to inform petitioner of his hospitalization because he was very sick at that time.

During cross-examination, respondent admitted never meeting or knowing the children's previous teachers or Daniel's T-ball coach, and that he had not participated in the children's counseling. Respondent testified that no physician that he saw told him not to work in November of 1991. He simply found it impossible to work. Respondent stated that he was "a mess" in January and February 1992, but he believed that as of the time of trial he was able to provide for the

children because of his very stable employment, his health, and his psychological state.

An *in camera* conference with the children of the parties was held in the presence of the court, counsel, and a court reporter. Both children professed a love for both of their parents, but both preferred to live with their mother. Both children testified consistently with the statements that they had made to Dr. Cuneo and also related incidents of respondent's discipline of Daniel.

The last witness that testified at the trial was Donald Clyner, a private investigator, who testified on behalf of the petitioner. Mr. Clyner testified that on February 13, 1992, along with an escort from the local police department, he took petitioner to the marital domicile to remove her personal nonmarital items pursuant to court order. Mr. Clyner testified that he and the police officer went to the front door where they were met by respondent's mother, who was irritated and screaming because they were present approximately 10 minutes early. After petitioner entered the home, respondent's mother again appeared and "hollered" at petitioner that she had no right to be in the house. During the removal of petitioner's items, respondent hovered nearby and supervised and examined each and every item to be removed.

Following the trial on June 12, 1992, the trial court entered a judgment of dissolution of marriage finding that the respondent, without fault, cause, or provocation on the part of the petitioner, had been guilty of acts of extreme and repeated mental cruelty. Respondent was found to have dissipated marital assets in the amount of $2,500, and judgment was entered for petitioner in the entire amount found to have been dissipated. Petitioner was awarded the sole custody of the minor children. Respondent was awarded alternate weekends, alternate holiday visitation, and the trial court awarded various marital personal property to each party.

The trial court on June 12, 1992, entered a memorandum order to provide further specification of certain provisions of the judgment necessitated by the "extraordinary failure of the parties to agree on even minor matters." In the memorandum order the trial court found for dissipation purposes that the marriage was irretrievably broken as of November 30, 1991, and stated: "Dissipation has been established with respect to the difference between the purchase price of the auto and its present value, interest was included, and with respect to one half of the amount initially paid by petitioner [*sic*] to his attorney. There is a failure of proof with respect to the remainder claimed dissipated." The trial court set forth a table valuing and allocating the

marital assets of the parties and indicated that it was attempting to award each party assets of $63,350.

The trial court noted that while it awarded sole custody of the minor children to petitioner and rejected joint custody as not being in the best interests of the children, the trial court recognized respondent's importance to the children. The trial court did not restrict respondent's visitation, preferring to allow visitation to be maximized by agreement of the parties, notwithstanding the trial court's admitted skepticism concerning the ability of the parties to cooperate with respect to their children. Respondent was ordered to refrain from discussing his health and life expectancy with the children.

Following the entry of the judgment of dissolution and memorandum order, the parties filed post-trial motions seeking relief therefrom. On November 10, 1992, the trial court entered an order after considering the alleged errors and found that it had not erred in its determination of custody and support and in the distribution of property. The trial court did make some minor changes to the visitation schedule and to respondent's obligation to maintain his life insurance, which are not germane to our inquiry. For the reasons that follow, we affirm.

The first issue raised on appeal by respondent is whether the trial court lacked subject matter jurisdiction to hear the dissolution proceedings when it failed to bifurcate the proceedings and hear the issue of grounds first.

Section 403(e) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 101 *et seq.* (now 750 ILCS 5/101 *et seq.* (West 1992))) provides in pertinent part:

"Contested trials shall be on a bifurcated basis with the grounds being tried first. Upon the court determining that the grounds exist, the court may allow additional time for the parties to settle amicably the remaining issues before resuming the trial, or may proceed immediately to trial on the remaining issues." Ill. Rev. Stat. 1991, ch. 40, par. 403(e) (now 750 ILCS 5/403(e) (West 1992)).

Respondent argues that strict construction of section 403(e) of the Act is required and failure to follow its mandate leaves a trial court without subject matter jurisdiction. In support of this argument respondent cites *In re Marriage of Robinson* (1992), 225 Ill. App. 3d 1037, 588 N.E.2d 1243, which held that the trial court lacked subject matter jurisdiction when the parties failed to execute a written waiver of the two-year waiting period for the grounds of irreconcilable differences although the parties entered into an oral waiver of

the time period and the trial court had indicated in open court to both parties that it was necessary to file a written stipulation. Petitioner argues that the issue of subject matter jurisdiction is not properly before this court because it was waived as respondent failed to raise it during trial or in his post-trial motion. Respondent concedes that he failed to raise this issue at trial and in his post-trial motion but contends that issues of subject matter jurisdiction cannot be waived and may be raised for the first time on appeal.

Respondent is correct in his assertion that the general rule is that lack of subject matter jurisdiction may be raised for the first time on appeal. (*Werner v. Illinois Central R.R. Co.* (1942), 379 Ill. 559, 42 N.E.2d 82; *People ex rel. Person v. Miller* (1977), 56 Ill. App. 3d 450, 371 N.E.2d 1012.) It is also well established that a decree issued by a court which lacks jurisdiction to hear and determine a case is a nullity and may be attacked at any time or in any proceedings. (*Tucker v. Tucker* (1975), 29 Ill. App. 3d 489, 330 N.E.2d 274.) Because want of subject jurisdiction cannot be waived, a court will take notice of it when it appears, even if the parties fail to raise the question. *In re B.K.* (1984), 121 Ill. App. 3d 662, 664, 460 N.E.2d 43, 45.

The issue of subject matter jurisdiction in dissolution of marriage cases is a confusing area of the law often leading to unfortunate results such as found in the *Robinson* case. We are also aware that one appellate court has held that statutory enactments regarding dissolution of marriage are subject to the paramount law of Illinois as expressed in the constitution and in the judicial articles and are equivalent to rules of procedure. *English v. English* (1979), 72 Ill. App. 3d 736, 742, 393 N.E.2d 18, 22.

We decline to follow the *Robinson* and *English* decisions, and in accordance with the decisions of our supreme court we hold that jurisdiction of the subject matter does not mean simply jurisdiction of the particular case before the court but jurisdiction of the class of cases to which the particular case before the court belongs. (*People ex rel. Scott v. Janson* (1974), 57 Ill. 2d 451, 312 N.E.2d 620; *People v. Western Tire Auto Stores, Inc.* (1965), 32 Ill. 2d 527, 207 N.E.2d 474.) Where the subject matter of the litigation is within the general jurisdiction of the trial court, the claim of want of jurisdiction by reason of the existence of irregularities, or exceptional or special circumstances, or because the court had no jurisdiction to render the particular judgment or order cannot be made for the first time on appeal. *Central Pattern & Foundry Co. v. Industrial Comm'n* (1940), 374 Ill. 300, 29 N.E.2d 511; *In re Estate of Ray* (1972), 7 Ill. App. 3d 433, 287 N.E.2d 144.

■ There is no dispute that dissolution proceedings are within the general jurisdiction of circuit courts. The real question posed by respondent concerns jurisdiction of this particular case rather than the general jurisdiction of the subject matter. In such cases, the rule is that where the parties have adjudicated their rights before the court to a final judgment without objection to the court's right to hear the cause, the parties will be bound on appeal so far as the question of jurisdiction over the particular case is concerned. (*In re Estate of Fisher* (1951), 409 Ill. 420, 100 N.E.2d 564; *Pocahontas Mining Co. v. Industrial Comm'n* (1922), 301 Ill. 462, 134 N.E. 160.) Therefore, respondent is bound by and may not now challenge the trial court's jurisdiction to hear this case.

The next issue raised by respondent on appeal is whether the trial court erred in finding that grounds of extreme and repeated mental cruelty were established. Respondent argues that the evidence that petitioner presented at trial concerning grounds was insufficient to support a finding of extreme and repeated mental cruelty and, further, that petitioner failed to prove the requisite lack of cause or provocation on her part; hence, the trial court improperly granted a dissolution.

Petitioner counters that the grounds were not contested at trial, and that the issue of the sufficiency of the grounds is not properly before this court as respondent failed to raise this issue at trial and in his post-trial motion. Petitioner alternatively argues that if the issue of the sufficiency of the grounds is properly before this court there was sufficient evidence introduced at trial to establish grounds.

As we have previously held, the failure to object to the sufficiency of proof presented during a trial does not constitute a waiver of the right to appeal the issue. (*In re Marriage of Douglas* (1990), 195 Ill. App. 3d 1053, 552 N.E.2d 1346.) With respect to petitioner's argument that respondent failed to include this issue in his post-trial motion, section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1203 (now 735 ILCS 5/2—1203 (West 1992))) governs post-trial motions in nonjury cases and does not mandate the detail as required by section 2—1202, which applies to jury cases (Ill. Rev. Stat. 1991, ch. 110, par. 2—1202 (now 735 ILCS 5/2—1202 (West 1992))). We believe that the issue of sufficiency of the grounds in the instant case is properly before us.

Section 401 of the Act provides:

"The court shall enter a judgment of dissolution of marriage if *** one of the following grounds for dissolution has been proved:

(1) That, without cause or provocation by the petitioner: *** the respondent *** has been guilty of extreme and repeated physical or mental cruelty ***." Ill. Rev. Stat. 1991, ch. 40, par. 401(a)(1) (now 750 ILCS 5/401(a)(1) (West 1992)).

We have previously defined mental cruelty as a course of unprovoked, offensive conduct toward one's spouse which causes embarrassment, humiliation, and anguish as to render the spouse's life miserable and unendurable (*In re Marriage of Ducey* (1981), 101 Ill. App. 3d 957, 428 N.E.2d 1165) and which affects the spouse's physical or mental health. *In re Marriage of Rittmeyer* (1982), 107 Ill. App. 3d 892, 438 N.E.2d 237.

The determination of the issue of grounds for dissolution of marriage is a matter for the trial judge, and that finding will not be disturbed unless it is against the manifest weight of the evidence. (*In re Marriage of Burrows* (1984), 126 Ill. App. 3d 752, 467 N.E.2d 987.) Great deference is given to circuit court findings as to the existence of the requisite mental cruelty. *Hollo v. Hollo* (1985), 131 Ill. App. 3d 119, 474 N.E.2d 827.

In support of the trial court's determination, we note that the petitioner testified that respondent accused her of being unfaithful and giving him an infectious venereal disease. Petitioner testified also to respondent's obsession with his physical health, the fact that he was convinced that he was dying, and respondent's invitation to his parents to move into the marital domicile over her objection. Petitioner, at trial, recounted that she asked respondent to see a psychiatrist and requested that respondent ask his parents to leave the marital domicile, and respondent *refused both of her requests.* Petitioner testified that all of this conduct caused her to be emotionally upset and anguished and that life in the marital domicile was intolerable. Petitioner also stated that she had done nothing to provoke respondent's conduct.

It has been held that the testimony of a complainant that a certain act or certain acts caused mental cruelty is enough to authorize dissolution on that ground, without additional corroboration, if the testimony was sufficiently credible, in light of the opposing evidence, to warrant acceptance by a reasonable person. *Bilsky v. Bilsky* (1974), 18 Ill. App. 3d 329, 309 N.E.2d 697.

In the case before us, the petitioner's testimony was corroborated by other witnesses such as Olga DeTorres, Dr. Cuneo, respondent, and Donald Clyner. Olga DeTorres and Dr. Cuneo both testified that respondent accused petitioner of being unfaithful and giving him a sexually transmitted disease. Respondent admitted that he asked his

parents to come and live in the marital domicile and refused to ask them to leave. Respondent also admitted his refusal to see a psychiatrist. Donald Clyner testified to respondent's mother's conduct toward petitioner in the marital domicile, although admittedly the conduct Mr. Clyner observed took place after the parties' separation.

■ We believe that respondent's acts toward petitioner, including his accusations that petitioner was unfaithful and had contracted and transmitted a disease to him as well as his refusal, after petitioner's request, to remove his parents from the marital domicile when it had become apparent that the arrangement was not harmonious, constituted offensive conduct toward petitioner which would cause any reasonable person embarrassment, humiliation, and anguish such as to affect their physical and or mental health.

Directing our attention to respondent's allegation that the petitioner failed to prove the requisite lack of cause or provocation on her part, we disagree. The petitioner testified that she had done nothing to provoke respondent's conduct. The burden of proving lack of provocation remains with the complaining party; the burden of going forward shifts to the defending party once it has been denied, explicitly or implicitly, that acts alleged to be mental cruelty were provoked. (*In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 266, 511 N.E.2d 156, 164.) The record is void of any evidence introduced by respondent that the acts petitioner complained of were provoked by petitioner.

Respondent argues for the first time in his reply brief that the failure to properly bifurcate the hearing should not give petitioner the ability to cite to testimony in other areas of the trial, outside the brief grounds hearing portion of the proceedings, to bolster the "conclusionary testimony" on grounds. Respondent contends that even if the court considered the testimony in other areas of the proceedings, petitioner did not meet the mandated standards to establish grounds. We note that this argument is waived pursuant to Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), which provides that points not argued are waived and shall not be raised in the reply brief.

If we were to address respondent's argument, however, we would find it without merit. For although we cannot condone the failure to bifurcate the case before us, we cannot find in the record that respondent objected to the order of witnesses or objected to the fact that the case was not bifurcated with grounds being tried first. It is not uncommon for witnesses in trials to be taken out of order for the convenience of the witnesses. There is no doubt that Olga DeTorres testified without objection before the brief hearing regarding grounds.

Petitioner also testified extensively to grounds, without objection, before the brief grounds hearing.

Accordingly, we find no error in the trial court's judgment granting petitioner a dissolution of marriage based upon mental cruelty.

Next, respondent asserts that the trial court erred in the distribution of the marital property. It is respondent's position that the trial court committed reversible error in failing to utilize values stipulated to during the trial in its disposition of property. In its memorandum order, which the court found necessary because of the "extraordinary failure of the parties to agree on even minor matters," the court utilized the values which petitioner submitted in writing, yet the record reveals that on several occasions during the trial petitioner's counsel stipulated to the values assessed by respondent as she refused "to quibble" over amounts of less than $25. Respondent also charges the trial court with mathematical errors and computing some property in the distribution more than once. Respondent admits that he is not contesting the court's division of property, but he complains instead of the alleged errors in mathematics and values assigned by the court.

Pursuant to the memorandum order, the trial court apparently made the determination that a just and equitable division would be an equal one. The trial court attempted to award each party assets of $63,350. A reading of respondent's brief indicates that the amount respondent disputes is roughly $1,250 or approximately 1% of the total assets of the parties.

Section 503(d) of the Act requires that the trial court divide property in "just proportions." (Ill. Rev. Stat. 1991, ch. 40, par. 503(d) (now 750 ILCS 5/503(d) (West 1992)).) The court is to consider all relevant factors which, in this case, include: the duration of the marriage; the value of the property set apart to each spouse; the relevant economic circumstances of each spouse; the amounts and sources of each spouse's income; the age, occupation, vocational skills, employability, and needs of each party; whether the apportionment is in lieu of or in addition to maintenance; and the reasonable opportunity for each spouse for future acquisition of assets and income. Ill. Rev. Stat. 1991, ch. 40, par. 503(d) (now 750 ILCS 5/503(d) (West 1992)).

While it is true that, absent fraud or collusion, a stipulation as to the value of property is binding in a dissolution action (*In re Marriage of Davis* (1991), 215 Ill. App. 3d 763, 776, 576 N.E.2d 44, 53), the touchstone of proper apportionment is whether the directed distribution is equitable in nature. (*In re Marriage of Simmons* (1981), 101 Ill. App. 3d 645, 647, 428 N.E.2d 1032, 1034.) The trial court is not required by the statute to divide the property with mathematical

equality (*In re Marriage of Ligas* (1982), 110 Ill. App. 3d 1, 5, 441 N.E.2d 1277, 1281; *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1132, 398 N.E.2d 126, 132), nor is there a requirement that the trial court place specific values on each item of property when dividing it. *In re Marriage of Randall* (1987), 157 Ill. App. 3d 892, 896, 510 N.E.2d 1153, 1156.

It is well recognized that a court has broad discretion in distributing marital property, and absent an abuse of discretion, the court's distribution will not be overturned upon review. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26, 30, 482 N.E.2d 1022, 1024.) The standard used in determining whether the trial court abused its discretion is whether no reasonable person would take the view adopted by the court. *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 230, 505 N.E.2d 1294, 1300.

■ We cannot say in the case before us that no reasonable person would take the view adopted by the trial court in distributing the marital property on an essentially equal basis given the amount and nature of the marital property and the amount of the alleged errors. We accordingly hold that the trial court did not abuse its discretion in apportioning the marital property of the parties.

Next, respondent argues that the trial court erred in finding that he had dissipated $2,500 of marital assets.

Respondent argues that the trial court erred in including the vehicle he purchased after the parties separated in its findings of dissipation, as the car's value was listed as marital and was distributed by the trial court as marital property. The respondent further alleges that the trial court erred in finding dissipation equal to one half of respondent's attorney fee retainer and by entering judgment for petitioner for all sums found to have been dissipated rather than charging the sum against respondent's share of the assets or entering judgment for petitioner for one half of the sum found to have been dissipated.

Petitioner responds that respondent should have been found to have dissipated marital assets in a sum greater than the $2,500 the trial court granted judgment on to petitioner. We agree.

Section 503 of the Act provides that certain factors are to be considered by the court when distributing marital property, including:

> "(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property ***." Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1) (now 750 ILCS 5/503(d)(1) (West 1992)).

Our supreme court has held that dissipation refers to the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 495, 563 N.E.2d 494, 498-99.) The trial court in the instant case found that the parties' marriage was irreconcilably broken as of November 30, 1991. This finding is consistent with our previous ruling in *In re Marriage of Hazel* (1991), 219 Ill. App. 3d 920, 579 N.E.2d 1265, that the date of physical separation is the date upon which a marriage becomes irreconcilably broken for purposes of dissipation.

Addressing first respondent's argument that the trial court erred in awarding the petitioner the entire sum that it found that respondent had dissipated, a review of the Act reveals that the Act does not mandate an award of cash or property equal to one half of the amount dissipated. *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464, 426 N.E.2d 1087, 1096.

There is no dispute that respondent removed $17,286.48 from the parties' joint bank accounts shortly after petitioner left the marital residence on November 30, 1991. Respondent admitted at trial that he spent all of these funds in less than one month although he acknowledged that he received his regular salary of approximately $4,000 during this period of time for a total of $21,286.48 in his exclusive control. Respondent prepared a list of expenditures, and the list was introduced into evidence at trial. In some fashion, respondent accounted for $18,837.07 of the $21,286.48 in his control.

The trial court found in its memorandum order of June 12, 1992, as follows: "Dissipation has been established with respect to the "difference between the purchase price of the auto and its present value, interest was included, and with respect to one half of the amount initially paid by petitioner [*sic*] to his attorney. There is a failure of proof with respect to the remainder claim dissipated."

Although respondent testified that he was barely able to get out of bed except to go to the bathroom, he managed to go to the bank and withdraw $17,286.48 in savings. He also managed to buy a new automobile for approximately $9,000 and spend another $9,000 of the savings as well as $4,000 of his income.

Once it is established that one party has liquidated marital assets, the party charged with dissipation must establish by clear and specific evidence how the funds were spent; general and vague statements that they were spent on marital expenses and bills are inadequate to avoid a finding of dissipation. (*In re Marriage of Smith* (1984), 128 Ill.

App. 3d 1017, 1022, 471 N.E.2d 1008, 1013.) The trial court erroneously concluded that petitioner had the burden of proof with respect to the dissipation of marital assets by respondent when it ruled that "[t]here is a failure of proof with respect to the remainder claimed dissipated." Clearly, once petitioner established that respondent had obtained exclusive control over the savings, the burden shifted to respondent to show by clear and convincing evidence specifically how the funds were spent.

A review of the list submitted into evidence by respondent at trial reveals that $2,000 is simply listed as living expenses, over $9,000 was paid for a new car, $2,500 was paid on a joint credit card, $2,500 was paid on attorney fees, and $1,000 is listed as payments "with receipts" from December 21, 1991, through February 18, 1992. Totally unaccounted for is $2,449.41 representing the difference between the $21,286.48 total respondent had in his control and the $18,837.07 that respondent accounted for in some fashion. The record further supports the conclusion that the difference between the purchase price of the automobile and the value of the vehicle at the time of trial was also a dissipation.

Although respondent concedes that generally the expenditure of marital assets for attorney fees is a dissipation of marital assets (*In re Marriage of Toth* (1991), 224 Ill. App. 3d 43, 50, 586 N.E.2d 436, 440), he argues that the $2,500 expenditure he made to his attorney in December was necessitated because petitioner "absconded" with the children to New York. A review of the record dispels this argument, as the vast majority of the pleadings filed in December 1991 dealt with issues other than the removal or return of the children, and petitioner agreed December 19, 1991, to return the children. The trial court, however, apparently took this argument of necessity into consideration and only charged respondent with dissipation of one half of the $2,500 paid by respondent to his attorney.

While we may not agree with the reasoning the trial court employed with respect to the dissipation of marital assets, it is the judgment and not what else may have been said by the trial court that is on appeal, and a judgment may be sustained if warranted by the record regardless of whether reasons given by the trial court were correct. (*Metro East Sanitary District v. Village of Sauget* (1985), 131 Ill. App. 3d 653, 475 N.E.2d 1327.) The record clearly reflects that the respondent dissipated a sum far greater than the $2,500 he was found by the trial court to have dissipated.

Lastly, respondent contends that the trial court abused its discretion in awarding sole custody of the minor children to petitioner. Re-

spondent argues that given the prior involvement of both parties with the children, the trial court should have awarded joint custody or in the alternative should have awarded sole custody to respondent. The basis of respondent's argument for sole custody relies upon petitioner's behavior and attitude as to the extent of time respondent should have with the children. Respondent points out that the final order in the case before us gives him much less time with the children than he had under the temporary order. We find respondent's arguments without merit and unsupported by the law and the record before us.

In cases regarding custody issues, there is a strong and compelling presumption in favor of the result reached by the trial court. The result will be reversed only if it is contrary to the manifest weight of the evidence. *In re Marriage of Slavenas* (1985), 139 Ill. App. 3d 581, 587, 487 N.E.2d 739, 742-43.

On the issue of custody, the Act provides:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person; and

(7) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." Ill. Rev. Stat. 1991, ch. 40, pars. 602(a), (b) (now 750 ILCS 5/602(a), (b) (West 1992)).

Respondent asserts that he should have been granted sole custody pursuant to section 602(a)(7) of the Act, because of petitioner's alleged unwillingness to facilitate and encourage a close and continuing relationship between the respondent and the children. The basis of respondent's argument rests upon the fact that petitioner removed the

children from Illinois in November 1991, when she left the marital domicile, and also because petitioner testified at trial to her desire that the court award respondent standard visitation rather than the extensive visitation arrangement employed during the temporary joint custody.

■ While we do not condone the removal of minor children from this jurisdiction to thwart a parent's visitation, it was petitioner's uncontradicted testimony that she and the children went to New York with her parents because she and the children were living in a hotel room and petitioner had no financial resources to obtain other accommodations and petitioner feared that the respondent might hide the children. It is undisputed that respondent removed approximately $17,000 from the parties' savings accounts and refused to share the money with petitioner, and respondent by all accounts was suffering from a mental illness that alarmed petitioner and the children. Given the facts and circumstances of this case, we do not believe that petitioner's desire and opinion that standard visitation would be in the best interests of the children indicates an unwillingness on petitioner's part to facilitate and encourage a close and continuing relationship between respondent and the children.

Dr. Cuneo was the only expert that testified regarding the issue of custody, and both parties had moved for his appointment to the case. It was Dr. Cuneo's recommendation based upon the psychological testing of the parties, interviews of the parties and the children, and a review of respondent's medical records that the petitioner be awarded sole custody.

It was respondent's uncontradicted testimony that he was very ill during the period petitioner and the children were in New York. He believed that he was dying. Respondent stated that he could barely drag himself from his bed. The record indicates that respondent told the children repeatedly during his illness of his belief that he was dying, that he would be placed in a wooden coffin, and that they would have to take care of each other after his death. From the children's testimony, it is apparent that it was respondent's discussions regarding his belief that he was dying, his behavior during his illness, and his personal acts of discipline toward the children that have encumbered his relationship with the children.

With respect to the issue of joint custody, the Act permits:

"(c) The court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child. However, such presumption shall not be con-

strued as a presumption that an order awarding joint custody is in the best interests of the child." Ill. Rev. Stat. 1991, ch. 40, par. 602(c) (now 750 ILCS 5/602(c) (West 1992)).

The Act permits a court to award joint custody if the court determines that it would be in the best interests of the children taking into account, among other things, the ability of the parents to cooperate effectively and consistently with each other toward the best interests of the children. Ill. Rev. Stat. 1991, ch. 40, par. 602.1 (now 750 ILCS 5/602.1 (West 1992)).

Dr. Cuneo testified at length that he did not feel that the parties were capable of exercising joint custody in an effective manner. In his opinion, the parties were incapable of reaching agreements on child-rearing issues because they each had inflexible personalities. Dr. Cuneo was the only expert witness that assessed the parties' personalities and their ability to compromise.

Petitioner testified to her inability to effectively deal with the respondent. Respondent argues on appeal that the parties have been able to cooperate and work together. A reading of the record dispels this argument. During the temporary joint custody arrangement, respondent had the petitioner and her parents arrested for disorderly conduct because of an alleged name-calling incident. Three months later, the respondent refused to allow the charges to be dropped and wanted the children to be brought into court to testify against their mother, the petitioner. The trial court felt compelled to enter a memorandum order because of the "extraordinary failure of the parties to agree on even minor issues." There are a number of problem areas especially with respect to health issues and the children's activities. From the record, it is apparent that the petitioner encourages the children to participate in sports and other activities, and that the respondent is uncomfortable with the children participating in these activities. Respondent maintains an extremely close supervision of the children during the activities which upsets the children. Based upon the record before us, we foresee an endless battleground with respect to any joint custody arrangement with the children being the casualties of the arrangement.

Addressing now respondent's argument that the final order afforded him substantially less time with the children than he had under the temporary joint custody order, we note: "A temporary order is provisional in character and continues only during the pendency of the action. When the action becomes final, the temporary order has fulfilled its purpose and is superseded by the provisions of the final decree." (*In re Marriage of Simmons* (1991), 221 Ill. App. 3d 89, 91,

581 N.E.2d 716, 718-19.) It is a sad truth that after a dissolution of marriage a parent is often afforded less time with his or her children than he or she would have enjoyed had the marriage survived. In the instant case, the temporary order was entered before the trial court had heard all the evidence including the children's testimony and Dr. Cuneo's opinions and recommendations regarding custody.

We find that the trial court's ruling on custody was not contrary to the manifest weight of the evidence.

Affirmed.

LEWIS, P.J., and CHAPMAN, J., concur.