# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of D.T.W.*, 2011 IL App (1st) 111225

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF D.T.W., Petitioner-Appellee, and S.L.W., Respondent-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-1225 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | November 23, 2011<br><br>December 21, 2011<br>December 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Trial court's award of custody of the parties' minor children to petitioner and grant of his petition to remove the children from Illinois to Florida was affirmed over respondent's contentions that the court did not have subject matter jurisdiction to enter the custody order, the court's custody judgment was against the manifest weight of the evidence, and petitioner did not meet his burden of proof that removal of the children was in their best interests. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-D-11714; the Hon. Renee Goldfarb, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Schiller Du Canto & Fleck, LLP (Sarane C. Siewerth, of counsel), and Kalcheim Haber, LLP (Michael A. Haber and Lauren Bernay, of counsel), both of Chicago, for appellant.

James B. Pritikin, Sylvia A. Sotiras, and Michael D. Sevin, all of Nadler, Pritikin & Mirabelli, LLC, and Paul J. Bargiel, of Paul J. Bargiel, P.C., both of Chicago, for appellee.

Lester L. Barclay, of Barclay, Dixon & Smith, P.C., of Chicago, guardian *ad litem*.

Panel

PRESIDING JUSTICE QUINN delivered the judgment of the court, with opinion.

Justices Garcia and R. Gordon concurred in the judgment and opinion.

## OPINION

¶ 1   Respondent S.L. appeals a trial court order granting petitioner D.T. sole custody of the parties' two minor children. We affirm.[1]

¶ 2   The parties were married on May 18, 2002, in Cook County, Illinois. The parties had two children: Z.B.D. born on February 4, 2002, and Z.M.A. born on May 29, 2007. D.T. filed a *praecipe* for summons in suit for a dissolution of marriage on November 26, 2007. He also filed a petition for dissolution of marriage on May 27, 2008, seeking joint custody of the children. Respondent filed a counterpetition for dissolution of marriage on August 13, 2008, seeking sole custody. On March 29, 2010, D.T. filed a petition for sole custody and amended his petition for dissolution of marriage to reflect this change. The dissolution of marriage and custody proceedings were bifurcated and a judgment dissolving the marriage was entered on June 25, 2010. After a 38-day custody trial, the court issued a 102-page written order awarding sole custody of the children to D.T.

¶ 3   At the custody trial, the court heard testimony from D.T., respondent, their friends and relatives and other persons acquainted with the family. The court also heard testimony from Doctor Phyllis Amabile, a board-certified psychiatrist and forensic psychiatrist appointed by

---

[1]Justice Cahill filed the court's judgment on November 23, 2011, as an order under Illinois Supreme Court Rule 23 (eff. July 1, 2011). We granted appellant's motion to publish the decision after Justice Cahill's death on December 4, 2011. Justice Quinn read the briefs and Justice Cahill's Rule 23 order. No substantive changes were made to the original decision by Justice Cahill.

the court as an expert on custody and visitation under section 604(b) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/604(b) (West 2008)). Amabile conducted multiple interviews with D.T. and respondent and two interviews with Z.B.D., who was eight years old at the time. Amabile also observed D.T. and respondent interact with the children and conducted several interviews with collateral persons acquainted with the family. She further reviewed pleadings, motions, medical records and other relevant documents. Amabile filed a report with the court on May 6, 2010 (report), documenting her findings. In the event joint custody was not deemed appropriate by the court, Amabile filed a supplemental report addressing the issue of sole custody (supplemental report) on July 26, 2010. The following facts are taken from the testimonial evidence heard by the court and Doctor Amabile's reports.

¶ 4    D.T. was born on January 17, 1982, and spent the first eight years of his life living with his mother, JoLinda and older sister, Tragil. JoLinda had drug-related problems at the time and was incarcerated. Tragil testified that the living arrangement was rather unique because she took on a parental role with D.T. D.T. testified that Tragil was his caretaker and best friend. When D.T. was nine years old he moved in with his father and stepfamily in Robbins, Illinois. There, D.T. met respondent in grade school. The parties began dating when they were teenagers in high school. D.T. was one year behind respondent in school. During D.T.'s senior year, after respondent left for Eastern Illinois University, D.T. moved in with respondent's mother, Darlene Funches. D.T. testified that Darlene provided him with a stable home environment and was like another mother to him. D.T. lived with Darlene until he graduated high school. With Darlene's help, D.T. secured a college scholarship to play basketball at Marquette University. D.T. testified that he has become estranged from Darlene during the divorce proceeding. He said he would like to reconcile with her and foster a relationship between her and the children.

¶ 5    Respondent left Eastern Illinois University at the beginning of her sophomore year. She moved back to Chicago and became pregnant with the parties' first child, Z.B.D., who was born on February 4, 2002. The parties were married on May 18, 2002. After marrying D.T., respondent moved to Milwaukee, Wisconsin, and enrolled at Marquette University. Doctor Amabile noted in her report that from Z.B.D.'s birth to the summer of 2003, both parties were very involved with Z.B.D.'s upbringing.

¶ 6    In 2003, during D.T.'s junior year of college, he was drafted into the National Basketball Association by the Miami Heat. The parties moved to the Doral Isles neighborhood in Miami, Florida. Doctor Amabile noted in her report that although D.T. was busy with his basketball schedule and spent a lot of time away from home, he made an effort to be a good father to Z.B.D. D.T. testified that Andrea Williams, respondent's best friend, moved into the Doral Isles home with the parties because respondent was lonely. Andrea is the godmother of both Z.B.D. and Z.M.A. Andrea testified that she looked after Z.B.D. in Florida.

¶ 7    In 2006, the parties moved into a house in Pinecrest, Florida. Both D.T. and respondent testified that their Pinecrest residence was beautiful. Z.B.D. attended a Presbyterian school in Miami which the parties agreed was a very good school. Tragil and Andrea moved into the Pinecrest house and helped take care of Z.B.D. Tomasa Garcia, the parties' housekeeper,

also helped take care of Z.B.D.

¶ 8 Z.M.A. was born in Chicago on May 29, 2007. Doctor Amabile testified that the bond between Z.M.A. and Z.B.D. is very strong. She said Z.M.A. looks to Z.B.D. as a source of security. Amabile said that both D.T. and respondent love and adore the children and exhibited wonderful interaction with each child. At trial, Amabile described respondent's strengths as loving, affectionate and consistent. She said respondent is very attached to the children and has been their primary caretaker since they were born. She acknowledged that respondent has had substantial help caring for the children. D.T. described the bond between respondent and the children as unbelievable and attached. Amabile noted that the children were very comfortable around respondent.

¶ 9 Doctor Amabile testified that D.T. loves the children deeply and has an identification with the parenting role. Amabile said that during her observations of D.T. with the children, she found it important that he demonstrated patience, empathy and love. She also observed that D.T. was playful, engaged and verbally affectionate with the children. Amabile said D.T. is a good teacher, has a nice sense of humor and is committed to the goal of the children doing well in the future. She said D.T. wants what is best for the children. She also said that it is important to D.T. to be a better father to his children than his father was for him and that D.T. has worked hard to accomplish that goal. The children love being with D.T. and are very comfortable around him. When the children visit D.T. in Miami, he plans activities ahead of time and provides them with a schedule and routine. Amabile noted in her report that D.T. relies heavily on his sister Tragil, his mother JoLinda and his housekeeper Tomasa for much of the hands-on care and supervision of the children.

¶ 10 Tragil has a bachelor's degree in elementary education and is a co-principal of a school. Tragil loves the children and has a great relationship with them. Tragil testified that if D.T. is awarded sole custody of the children she would move to Miami to assist him. Amabile testified that the children would be in good hands with Tragil as their caretaker. Amabile also testified that she was impressed with JoLinda's sincerity and concern about D.T. and the children. JoLinda took responsibility for being an absentee mother and acknowledged that she was given a second chance. Amabile said she was impressed favorably with JoLinda. Amabile further testified that Tomasa loved the children and was concerned about them. She said Tomasa was a positive influence on the children.

¶ 11 The parties' marriage began to experience difficulties around the time Z.M.A. was born. In August 2007, D.T. moved out of the Pinecrest residence and into a hotel. He had no set schedule for visitation with the children. Doctor Amabile noted in her report that she was critical of respondent's attitude on fostering a relationship between D.T. and the children during this time before the court ordered visitation. Amabile said that for a long period of time, respondent made visitation with the children challenging for D.T. Amabile noted that respondent negatively controlled D.T.'s access to the children.

¶ 12 D.T. filed a petition for dissolution of marriage in Chicago on May 27, 2008. Respondent then left Florida and moved to South Holland, Illinois, where the parties owned a second home. Respondent testified she moved with the children to Illinois to be near her mother. She said that Z.B.D. had completed the school year before they moved. D.T. testified that the

move occurred before the school year ended for Z.B.D. and that respondent did not tell him she was moving back to Illinois. Doctor Amabile noted in her report that D.T. did not object to the move. D.T. denied telling Amabile that he did not object to the move. Although D.T. was under contract in Miami and remained there, he purchased a home for himself in Chicago.

¶ 13    Respondent enrolled Z.B.D. at Calvary Academy, a private Christian school in South Holland, Illinois. Z.M.A. is enrolled at the Calvary Academy day care program. D.T. testified that Calvary Academy is a good school and that Z.B.D. is receiving a good education. D.T. said that respondent's decision to enroll the children at Calvary Academy was a good decision. Sandy Bacheldor, an assistant in the office of Calvary Academy, testified that Z.B.D. is well liked by staff and students and is doing well academically and socially. Z.B.D.'s report cards show that he receives good grades. Z.B.D. participates in soccer through the South Holland park district, plays on a South Holland little league baseball team and participates in summer camps. All witnesses agreed that Z.M.A. is a delightful, active and well-adjusted young boy.

¶ 14    After respondent and the children moved to Illinois, visitation problems arose. D.T. testified that he had problems contacting Z.B.D. because he had to ask respondent's permission to do so. He said he felt respondent was punishing him. Respondent claimed it was D.T.'s fault for not contacting the children more often. After continued disputes, a parenting schedule was proposed by the court. The parties failed to agree on the schedule. D.T. sought parenting time in Florida during the basketball season while respondent sought parenting time for D.T. only in Chicago. In November 2008, D.T. sought court intervention to establish parenting time for him.

¶ 15    The next two years involved numerous motions and court orders regarding parenting time for D.T. Doctor Amabile noted in her report that respondent was controlling and resistant to authority on the issue of visitation. Amabile said that even after the court ordered parenting time for D.T., respondent attempted to interfere with D.T.'s relationship with the children. She pointed out that respondent had twice sought medical care for the children just before a scheduled parental visit, leading to a curtailment, restriction or cancellation of D.T.'s visit. Amabile testified that taking the children to the hospital before a scheduled visit was volitional on respondent's part. She said that respondent's actions were not in the best interests of the children. We recount some of the incidents surrounding D.T.'s visits below.

¶ 16    On December 17, 2008, the court ordered parenting time for D.T. in Florida. The order directed that D.T. was to spend Christmas with the children, that he could visit the children away from the parties' house and that respondent would not withhold her consent to this. In December 2008, respondent and the children traveled to Florida and stayed at the parties' Pinecrest residence. On December 24, 2008, the day before D.T.'s scheduled visit, respondent called D.T. and told him that Z.M.A. was sick with pneumonia, Z.B.D. was getting sick and she did not want them leaving the house. D.T. went to the house that evening for parenting time with the children as scheduled. He testified that when he arrived at the house, the front gate would not open. He called respondent but she did not answer. D.T. said the Pinecrest police arrived at the house and told him that respondent had called them. Officer Heather Setter testified in her deposition that respondent called police, saying that

-5-

a car was parked outside of the front gate of the house and that respondent believed it had something to do with a case in Chicago about money that had been stolen from the family. D.T. told police that he was at the house to see his children. Police accompanied D.T. to the front door of the house and told respondent that D.T. was there to see the children. Respondent allowed D.T. to enter the house but asked the officers to sit outside the house until he left.

¶ 17 Under the December 17, 2008, court order, D.T. was scheduled to visit with the children on Christmas Day 2008. On Christmas morning, respondent took the children to the emergency room of Baptist Hospital in Miami. Respondent testified that both children had a fever, a cough and did not sleep throughout the night. She said that Z.B.D. was coughing so hard he vomited in the car on the way back from the hospital. D.T. testified the children did not seem sick when he saw them on Christmas Eve. Respondent testified that when she brought the children to the hospital on Christmas morning there was nothing wrong with them but that they were sick the night before. Doctor Amabile noted in her report that respondent's description of the children's symptoms and symptom severity was not supported by medical evidence. Amabile's report questioned respondent's decision to take the children to the hospital on Christmas morning.

¶ 18 The court ordered parenting time for D.T. in Florida during Christmas 2009. Tragil went to the South Holland residence in December 2009 to pick up the children and transport them to the airport. Tragil was greeted at the house by respondent, respondent's mother Darlene and respondent's friend Nadgee Alarcon. Doctor Amabile described Nadgee as suspicious and hostile. Amabile said Nadgee had influence over respondent and was both a good and bad influence on the children. At the house, Nadgee told Tragil that the group wanted to pray before the visitation. Tragil agreed. Tragil told Amabile that Darlene began "speaking in tongues" and saying that Tragil never had a mother and did not have a father. Nadgee prayed and said Tragil was a slave to people. Tragil said Z.B.D. and Z.M.A. were present for the prayer. Amabile testified that Tragil cried when she recounted the story to her. Amabile said Z.M.A. likely did not understand what was happening but that this behavior likely had a negative effect on Z.B.D. by alienating him from his aunt Tragil.

¶ 19 The court ordered parenting time for D.T. to take place on February 5, 2010, the day after Z.B.D.'s birthday. Under the court order, Tragil was to pick up the children at the South Holland residence. The court ordered Lester Barclay, the children's attorney, to accompany Tragil to the residence because of the December 2009 prayer incident. On the day of D.T.'s scheduled visitation, respondent texted him a photo of Z.M.A. hunched over the toilet, vomiting. She said that Z.M.A. had a high fever and asked D.T. not to take him for visitation. D.T. called Tragil and told her that Z.M.A. was sick and could not come to the visitation. Tragil testified that when Barclay and she arrived at the South Holland residence, the gate did not open. Barclay called respondent's attorney. Tragil said they waited about 20 minutes for the gate to open. Nadgee drove the children to the gate. Tragil testified that Z.M.A. was not sick and did not vomit that day. The group went to a Chicago Bulls basketball game. Tragil said she believed the picture of Z.M.A. vomiting was not taken on the date of the scheduled visitation because Z.M.A.'s hair was shorter in the picture than it was on the date of visitation. D.T. also testified that the picture looked old for the same reason.

¶ 20    The court ordered parenting time for D.T. in Miami on March 12, 2010. Respondent unsuccessfully sought to transfer the visitation to Chicago and claimed in her court pleadings that she believed Z.B.D. should not be traveling to Miami. Under the court order, Tragil was to pick up the children after school from their South Holland residence and transport them to the airport. Tragil testified that when she arrived at the house, no one responded. She said neither respondent nor the children were at the house. Tragil waited outside of the front gate of the house for two hours. D.T. testified that Tragil called him and told him that no one was responding at the South Holland residence. D.T. called his attorney and Barclay, but neither knew where the children were.

¶ 21    Respondent testified that on March 12, 2010, she received a call from Calvary Academy, informing her that Z.B.D. had a headache. She said that Z.B.D. started complaining of headaches a few weeks after he returned from visiting D.T. in Miami in December 2009. Sandy Bacheldor, an assistant in the office of Calvary Academy, testified that a phone call was made on March 12, 2010, to respondent about Z.B.D.'s headache. Bacheldor said Z.B.D. had been having headaches for a while. Respondent testified that she drove to the school and picked up both children. When respondent returned to the house with the children, she called a pediatrician and then went to the hospital with Z.B.D. Respondent's mother, Darlene Funches, testified that she watched Z.M.A. while respondent took Z.B.D. to the hospital. Respondent said she lost her mobile phone and was unable to call D.T. or Tragil to tell them of the children's whereabouts. Respondent called her attorney that day and left a message because the attorney was not in the office. The attorney did not receive respondent's message. Respondent said she did not know anyone's telephone number and was unable to call D.T. or Barclay. D.T.'s attorneys received an e-mail on March 13, 2010, telling them that Z.B.D. was in the hospital.

¶ 22    Doctor Amabile noted in her report that respondent's failure to notify those who should have been notified about Z.B.D.'s hospital visit was a lapse of good co-parenting and of common courtesy. She said there was no excuse for respondent's conduct and that respondent's failure to notify D.T. created anxiety and ill will and inflamed the circumstances of the litigation.

¶ 23    The medical records from Z.B.D.'s March 12, 2010, hospital visit show that respondent told the doctors that Z.B.D. had an accident near a pool. According to respondent, Z.B.D. fell by the side of the pool, hit his head, became dizzy, rolled into the pool, lost consciousness and was under water for an unknown period of time. The hospital notes also say that Z.B.D. almost drowned. Z.B.D. was diagnosed with a sinus infection and prescribed medication for the infection.

¶ 24    Doctor Amabile discussed Z.B.D.'s accident in her report. Z.B.D. told Amabile that while visiting D.T. in Miami in December 2009, he was playing with his cousin by the pool. Z.B.D. slipped on the bricks, hit his chin and fell into the pool. Z.B.D. told Amabile his head did not go underwater. He pulled himself out of the pool, ran into the house and D.T. bandaged his chin. This sequence of events was corroborated by the testimony of both D.T. and Tragil. D.T. added that he did not take Z.B.D. to the hospital or tell respondent about the incident because Z.B.D. only had a scratch on his chin. Amabile testified that neither respondent nor Z.B.D. told her that Z.B.D. lost consciousness or was under water for a period

of time. She noted that Z.B.D. did not almost drown. Amabile said that respondent was embellishing some of the details of Z.B.D.'s accident and lying about others.

¶ 25 Doctor Amabile further noted in her report that although Z.B.D. did experience a headache on March 12, 2010, it appeared to be similar to other headaches he had been experiencing for a few weeks before that date. Amabile said that after reviewing Bacheldor's report about the headache, she was left with the impression that there was nothing out of the ordinary or extreme about Z.B.D.'s March 12, 2010, headache. Amabile questioned respondent's decision to take Z.B.D. to the hospital on the day D.T. was scheduled to visit with the children. Amabile noted in her report that respondent either did not believe D.T.'s visits with the children were important or it was a passive-aggressive expression of hostility on respondent's part. Amabile further pointed out that just a few days after the March 12, 2010, incident, respondent tried to obtain an order of protection against D.T. on the basis of Z.B.D.'s accident.

¶ 26 The petition for order of protection was filed by respondent in Markham court on March 19, 2010. The petition alleged that Z.B.D. was suffering from headaches as a result of hitting his head and nearly drowning while he was with D.T. in Miami. Respondent sought a denial of D.T.'s visitation and that he have no contact with the children by any means, either in person, by phone, e-mail or through third parties.

¶ 27 The court ordered makeup parenting time for D.T. on May 5, 2010, to May 7, 2010, in Chicago. Under the court order, D.T. was to take Z.B.D. to his doctor's appointment on May 6 and respondent was to meet them at the doctor's office. The court order noted that D.T. had not seen the children and that phone contact had been disrupted. D.T. filed a motion for Tragil to pick up the children from school on May 5, 2010, which the court granted. Respondent objected to the motion and filed an emergency motion to reconsider. Respondent's motion was denied.

¶ 28 On May 5, 2010, respondent picked up the children at school. Respondent testified that on that date she drove to the children's school at dismissal time to bring Z.B.D. a bag with medication. Respondent said she went to Bacheldor's office with the bag and waited there until 3:30 p.m. Respondent then left the school with the children. She said she took the children because Tragil was not there at 3 p.m., dismissal time. Respondent said she believed the court order was for the children to be picked up on dismissal from school. Bacheldor testified that if Z.B.D. was not picked up from school at dismissal time, the protocol would have been for Z.B.D. to go to the extended day care program, which lasts until 6 p.m.

¶ 29 Tragil testified she arrived at the school between 3:15 and 3:30 p.m. on May 5, 2010. She said the children were nowhere to be found. Bacheldor testified that she went to a meeting at 3:20 p.m. on May 5, 2010, and when she returned from the meeting at 3:55 p.m., Tragil was in her office, looking for the children. Tragil said she called family and friends and then called the police. Bacheldor testified that Tragil waited in the parking lot of the school until about 5:30 p.m. D.T. testified that he was in an airport when Z.B.D. called him on May 5, 2010. D.T. said Z.B.D. refused to tell D.T. where he was. D.T. did not visit with the children on May 5, 2010. He said he was disappointed and upset. Respondent took Z.B.D. to the doctor's office on May 6, 2010.

¶ 30     On that date, D.T. filed an emergency motion to transfer physical possession of the children. The court granted the motion and ordered immediate physical possession of the children be transferred to D.T. until May 9, 2010. The court ordered respondent to be in court on May 10, 2010, to explain why the previous court order was not obeyed. Respondent did not appear in court on May 10, 2010. The court issued a body attachment and $10,000 cash bond for respondent. The court noted that it was troubled by the pattern of behavior that was developing in this case and respondent's unwillingness to obey court orders that were not in her favor.

¶ 31     Doctor Amabile filed her first report with the court on May 6, 2010. Amabile was unaware of the May 5, 2010, incident at that time. Amabile concluded in the report that Z.B.D. was exhibiting signs of alienation from D.T. Amabile explained that alienation is the programming of a child by the alienating parent, in this case respondent, to believe that one parent is good and the other parent is bad with the goal that the child completely reject the other parent. Amabile said that Z.B.D.'s feelings toward D.T. were ambivalent. She said that during her interviews with Z.B.D., he made a number of negative statements about D.T. Z.B.D. talked about how D.T. abandoned respondent and left her while she was pregnant with Z.M.A. Amabile found Z.B.D.'s statements to be strange for a child of his age. Amabile also noted that in a questionnaire Z.B.D. answered at the Christian Counseling Center, he said that if he could change something about his life he would change D.T.'s soul. Z.B.D. described respondent in the questionnaire as good and wise. Amabile explained that she was troubled by Z.B.D.'s belief that D.T. had something wrong with his soul and Z.B.D.'s unbalanced view of his parents. Amabile said that these were signs of alienated thinking on Z.B.D.'s part.

¶ 32     Doctor Amabile also noted in this report that during one of her observations of the interaction between D.T. and the children, Z.B.D. wrote a note to her which read "I am going to ask my dad some [questions]." Z.B.D. then stood next to Amabile and asked D.T. a series of questions, including what Z.M.A. meant to him. Amabile said Z.B.D. asked the questions in a confrontational voice. Amabile testified that she has never in all of her years of experience seen a child do this. She said D.T. did a good job answering the questions, exhibiting patience, empathy and love.

¶ 33     Doctor Amabile described respondent in the report as loving and affectionate. Amabile said respondent loves the children, has a strong identification with the parenting role and is very attached to the children. Amabile noted that respondent has been the children's primary caretaker since they were born. But, Amabile also noted that respondent does not understand how she has placed the children in the middle of the parties' divorce, how Z.B.D. has suffered because of the pressure he feels and how it is wrong for her to say disparaging things about D.T. to the children. Amabile recommended joint custody with respondent as the primary residential parent. She advised respondent seek counseling with the goal of helping respondent learn to shelter the children from divorce conflicts and support the children's relationship with D.T.

¶ 34     Friday, May 29, 2010, was Z.M.A.'s third birthday. Although Friday would usually be the start of parenting time for D.T., Z.M.A. spent the day with respondent because the parties could not reach an agreement to share parenting time. Because of the lack of agreement, the

court entered an order on May 28, 2010, scheduling parenting time for D.T. to begin at 2 p.m. on Saturday, May 30, 2010. The court order provided that Tragil was to be the transporter of the children for this and future parenting visitations with D.T. Respondent objected to this arrangement.

¶ 35    Also on May 28, 2010, respondent filed a civil complaint for intentional infliction of emotional distress against Tragil in court at Markham. The lawsuit was brought by Z.B.D. and Z.M.A. through respondent. The complaint sought money damages and alleged that Tragil: placed the children in the care of strangers who were not authorized caregivers; deprived Z.B.D. of his cellular telephone so he could not contact respondent; left the children in the company of a young girl who forced Z.M.A. to kiss another young girl on the lips; failed to properly feed the children during visitation; and allowed both children to nearly drown while acting as a caregiver.

¶ 36    Doctor Amabile later testified at the custody trial that, except for the allegation that the children almost drowned, respondent did not tell her about the other allegations in the May 28, 2010, complaint. Amabile said respondent never told her that Tragil was emotionally damaging to the children. Amabile also said that her investigation did not reveal evidence of extreme or outrageous conduct on Tragil's part. She testified that Tragil loves the children and that the children love her. Amabile described the lawsuit as a "bad idea." She also said that it was another example of the process of alienation. Respondent testified at the custody trial that she filed the lawsuit against Tragil to protect the children.

¶ 37    On May 31, 2010, D.T. went to the South Holland residence with the court order for visitation. D.T. waited outside the front gate of the house for about one hour because the gate was closed. Respondent denied that she did not open the gate. D.T. called police. D.T. said he had a birthday party planned for Z.M.A. at D.T.'s house and that Z.M.A.'s whole family was going to attend the party. Z.B.D. exited the house and, in the presence of police, told D.T. that he did not want to go to Z.M.A.'s birthday party. The front gate of the house separated Z.B.D. from D.T. Respondent testified that Z.B.D. asked a police officer not to make him go to the party. D.T. took only Z.M.A. to the party.

¶ 38    The next day, D.T. filed an emergency motion for immediate turnover of the children. The court granted the motion and ordered the children be turned over to D.T. from June 2, 2010, to June 7, 2010, with the parties to appear in court on June 7, 2010. The court expressed its concern that respondent's actions were prolonging the litigation in this case.

¶ 39    Also on June 1, 2010, respondent went to the Markham court with Z.B.D. and filed a criminal petition for order of protection on behalf of Z.B.D. against Tragil. Respondent alleged in the petition that on May 30, 2010, Tragil hit Z.B.D. in the right arm with her fist. The petition sought for Tragil to have no contact with the children and included a request to prohibit Tragil from entering or remaining at Calvary Academy. The petition alleged that it was probable that Tragil would be under the influence of drugs and would likely be carrying weapons. Respondent later testified at the custody trial that she had never seen Tragil with a weapon and that she did not take Z.B.D. to the Markham court on June 1, 2010. She was impeached with the transcript of the June 1, 2010, proceeding. During the proceeding, respondent told the court that there was a history of abuse between Tragil and the children.

The petition indicated that there was no other pleading or action involving the parties pending before the court.

¶ 40   Tragil's criminal trial in Markham took place on September 2, 2010. Respondent signed Z.B.D. out of school on that date to testify against Tragil at the trial. Respondent later acknowledged at the custody trial that she alone was under subpoena by the State. At the criminal trial against Tragil, Z.B.D. testified that on May 30, 2010, Z.M.A. and he were in a car inside the front gate of the South Holland residence. Respondent's mother and Nadgee were also inside the car. Tragil was in another car parked outside of the front gate. When the gate opened, Z.M.A. ran to Tragil and entered her car. Z.B.D. said he stood by the gate for a few minutes, debating whether or not he wanted to go with Tragil. He then told Tragil that Z.M.A. and he did not want to go with her. Z.B.D. said Tragil grabbed his arm and he kicked her in the leg. Tragil then hit him with her fist. Z.B.D. said he then went to Tragil's car, unstrapped Z.M.A. from the car seat, removed him from the car and together ran back to Darlene's car.

¶ 41   On cross-examination, Z.B.D. acknowledged that he did not want to be in court and that he did not know he was going to be testifying at trial. He also acknowledged that testifying put him in a "funny position" because he had to pick a side between his mother and father. He further acknowledged that this made him uncomfortable and that he did not want to see anything bad happen to his aunt Tragil.

¶ 42   Tragil testified at the criminal trial that when she arrived at the South Holland residence on May 30, 2010, Z.M.A. ran out of the car driven by Darlene and jumped into Tragil's arms. Z.B.D. exited Darlene's car, threw his book bag on the ground and told Tragil he was not going to visitation. Tragil said Z.B.D. looked back in the direction of Darlene and Nadgee and that it appeared they told him to approach Tragil. Z.B.D. approached and threw his book bag on the ground again. Z.B.D.'s cousin exited Tragil's car and asked Z.B.D. why he did not want to go with them. Tragil heard Z.B.D. warn his cousin to go back inside the car because Z.B.D. was "about to do something." Z.B.D. then began to count backwards. When Tragil turned her back to Z.B.D., he began to kick her. Tragil said she called D.T.'s attorney because she did not know what else to do. D.T.'s attorney advised Tragil to leave the house. Tragil denied that she hit Z.B.D. with a closed fist. She was acquitted of all charges.

¶ 43   D.T. testified at the custody trial that he was angry that respondent put Z.B.D. in a position to testify against Tragil. Respondent testified at the custody trial that she believed the filing of the criminal case against Tragil served to foster a safe and healthy relationship between the children, Tragil and D.T.

¶ 44   Doctor Amabile testified at the custody trial that she was not aware that the criminal case against Tragil went to trial and that Z.B.D. testified against Tragil. Amabile said it was unlikely that Z.B.D. knew he was testifying against his aunt in a court of law and that she could be imprisoned. Amabile said that respondent exacerbated the pressure felt by Z.B.D. She also said that Z.B.D.'s actions on May 30, 2010, were part of the process of alienation from D.T. and Tragil.

¶ 45   Doctor Amabile filed her supplemental report with the court on July 26, 2010. The supplemental report addressed the issue of sole custody in the event joint custody was not

deemed appropriate by the court. Amabile considered a journal written by Z.B.D. that had been brought to the court's attention after her earlier report was filed. Respondent testified that Joy Bocanegra, a social worker with the Christian Counseling Center, had recommended Z.B.D. write in a journal. Respondent was impeached with evidence that Z.B.D. had not met with Bocanegra until January 20, 2010, and the first entry in the journal was dated January 2, 2010. Respondent did not inform the court, D.T. or Barclay that Z.B.D. was meeting with Bocanegra. The court terminated Bocanegra and ordered her to turn her records over to Amabile.

¶ 46     Amabile's supplemental report described Z.B.D.'s journal as being almost exclusively about D.T. and very negative. She noted that there was a lack of credibility and balance in the journal because Z.B.D. described D.T. as all bad and respondent as all or mostly good. Amabile also noted that the existence of the journal and Z.B.D.'s use of words such as "abuse" and "abandoned" raised questions of how the idea of writing a journal about D.T. originated and the source of Z.B.D.'s information about the events memorialized in the journal. Amabile said the journal was a sign of alienation from D.T. The supplemental report also discussed the following incident.

¶ 47     On May 14, 2010, Tragil went to Calvary Academy to pick up the children for visitation. Tragil testified at trial that she did not remember the date but Z.B.D. refused to go with her and hid under Bacheldor's desk. Tragil said Z.B.D. told her he did not want to go with her but he had a smile on his face. D.T. testified that both Tragil and Z.B.D. told him that Z.B.D. was hiding under Bacheldor's desk when Tragil arrived at the school. D.T. denied that Z.B.D. said he hid under the desk because he did not want to go with Tragil.

¶ 48     Bacheldor testified that Z.B.D. hid under her desk because he really did not want to go with Tragil to visitation. Bacheldor said that it did not appear to her that Z.B.D. was playing a joke on Tragil. She also said that Z.B.D. told her that he did not want to go with Tragil because Tragil was mean to him. Bacheldor further said that Z.B.D. was upset and that she had to coax him out from under her desk. When she did so, Z.B.D. threw a toy at Tragil. Bacheldor said that this was not done playfully. After Tragil and Z.B.D. left the school, Bacheldor wrote a letter memorializing the incident. She gave the letter to respondent.

¶ 49     In the supplemental report, Doctor Amabile found Z.B.D.'s refusal to go to visitation with Tragil on May 14, 2010, worrisome. Amabile noted that Z.B.D.'s negativity about D.T. had expanded to include D.T.'s sister, Tragil. Amabile said this was another indication of Z.B.D.'s alienation from D.T. Amabile found it noteworthy that Z.B.D. did not speak negatively about Tragil in his earlier interviews with Amabile.

¶ 50     Amabile noted in the supplemental report that respondent's counsel had reported to her that respondent had started individual therapy with a psychologist. At the custody trial, respondent informed the court that she was no longer seeing the psychologist. Respondent testified that she was seeing a psychiatrist but did not say when she started seeing the psychiatrist or when was the last time she met with the psychiatrist.

¶ 51     Doctor Amabile concluded in her July 26, 2010, report that if the parties could not agree to share joint custody as recommended in her May 6, 2010, report or if the court deemed joint custody impractical, sole custody should be awarded to respondent. Amabile's

conclusion was based on the fact that respondent has been the children's primary caregiver as opposed to D.T. who has been largely out of their lives since the time the parties separated. Amabile noted that sole custody of the children with respondent was a less desirable arrangement than joint custody because of the risk that respondent would abuse her authority and continue to alienate the children from D.T.

¶ 52     At the custody trial, Doctor Amabile testified that she did not contact the family over the summer of 2010. She said she was under the impression that D.T.'s summer visitation with the children went well. The court divided summer parenting time into alternating two week intervals with each parent. D.T.'s visitation schedule was June 13, 2010, to June 27, 2010; July 3, 2010, to July 13, 2010; and August 3, 2010, to August 18, 2010.

¶ 53     D.T.'s first two-week summer visitation with the children was without incident on the part of respondent. D.T., however, had taken the children to Boston for a sporting event without telling respondent, who saw them on television. Respondent said that this caused her distress.

¶ 54     On July 8, 2010, while the children were in Florida, D.T. took them to Orlando to the Disney World Resort. Z.B.D. called respondent on that date and told her he was going to Orlando. On the next day, July 9, 2010, respondent filed an emergency motion that she be granted parenting time *instanter*. Respondent alleged in the motion that she was not aware that the children would be traveling across state lines to Florida. The court denied respondent's motion. The court noted that on April 20, 2010, D.T. filed a motion requesting the children be in Florida on July 6, 2010, to July 8, 2010, for a basketball camp followed by a trip to Orlando so that he may take the children to the Disney attractions. Respondent had filed a *pro se* response to D.T.'s motion, asking the court to deny his request.

¶ 55     On August 2, 2010, the day before D.T.'s final two-week summer period of visitation with the children, respondent filed an emergency motion for supervised visitation. Respondent alleged that when Z.B.D. returned from Disney World, he told her that while he was there he told D.T. that he did not want to go on the "Tower of Terror" ride for a second time because he was scared and that D.T. told him to "man the [expletive deleted] up," picked him up by the shirt and threw him into a bus seat. Respondent alleged that Z.B.D. injured his back as a result of this incident. Respondent also alleged that Z.B.D. told her that Demetrius McDaniel, Z.B.D.'s uncle, picked up Z.M.A. and threw him to the ground. Respondent attached to the motion a letter dated July 29, 2010, from a doctor who had met with respondent and examined Z.B.D. on July 28, 2010. The doctor had not met with D.T. The doctor expressed concern for the safety of the children based on the Disney World incident and recommended that D.T.'s visitation be suspended or supervised. He also contacted the Department of Children and Family Services (DCFS) as a mandated reporter.

¶ 56     Six days later, on August 4, 2010, this same doctor wrote a letter to the court withdrawing his July 29, 2010, letter. The doctor explained that he did not have the other reports that had been prepared in the case, including those of Doctor Amabile and Z.B.D.'s other physicians, and that respondent did not give him consent to speak to anyone involved in the case, including Barclay, the children's representative. After meeting with respondent and Z.B.D., the doctor met with D.T. and observed D.T.'s interaction with Z.B.D. The doctor

wrote in his August 4, 2010, letter that the children were safe with D.T. and contacted DCFS to inform them of his revised assessment.

¶ 57       At the custody trial, respondent denied telling the doctor that he could not speak to anyone involved in the case. She said the doctor only requested to speak with Sandy Bacheldor, the school administrator. Doctor Amabile testified that respondent's motion for supervised visitation was a continued attempt to alienate the children from D.T. Amabile acknowledged that as soon as respondent received a medical assessment she believed would be sufficient to prevent D.T.'s visitation in August 2010, she sought to prevent the visitation.

¶ 58       In December 2010, the court ordered parenting time for D.T. to take place in Miami from December 26, 2010, at 3 p.m. to January 2, 2011, at 7 p.m. The order directed respondent's mother, Darlene, to escort the children to the Trump Hotel in Chicago where Tragil was to pick them up. Respondent sent an e-mail to her attorney on December 25, 2010, saying that Z.M.A. was throwing up, had trouble sleeping and was on medication. Respondent said that Z.M.A.'s doctor told her that if Z.M.A. developed a fever he should not travel. This e-mail was not received until 2:05 p.m. on December 26, 2010. Respondent's attorney e-mailed Barclay on December 26, 2010, informing him that respondent believed Z.M.A. was too sick to travel. The e-mail said that respondent would allow D.T. to decide whether or not Z.M.A. should travel to Florida. Z.B.D. went to Florida to visit with D.T. Z.M.A. did not go.

¶ 59       On December 28, 2010, Barclay filed an emergency motion to provide information about Z.M.A.'s condition to determine if some of D.T.'s parenting time could be salvaged. On that date, respondent informed the court that Z.M.A. had not yet been taken to the hospital and was going for the first time that afternoon because he had a fever. Respondent also informed the court that Z.M.A.'s fever was caused by ringworm which had spread to his face. Respondent e-mailed her attorney on December 30, 2010, saying that Z.M.A. still had a fever and that the doctor believed Z.M.A. had the flu. Respondent also said in the e-mail that the doctor believed Z.M.A.'s diarrhea was exacerbated by the ringworm medication. She further said that the bumps on Z.M.A.'s face from ringworm were healing and that Z.M.A. would return to school by January 7, 2011.

¶ 60       Z.M.A.'s medical records showed that he was diagnosed with ringworm on December 13, 2010. This diagnosis was accompanied by a doctor's note saying that Z.M.A. could return to school on December 15, 2010. The medical records also show that respondent took Z.M.A. to the hospital on December 20, 2010, because she was concerned that the ringworm had spread to his face. The doctor diagnosed Z.M.A. with eczema on the cheeks and discontinued the ringworm medication. The December 28, 2010, doctor's examination noted that Z.M.A. had an ear infection and mild congestion. Z.M.A. did not have a fever and his skin was free of eczema. Respondent brought Z.M.A. to the doctor on December 30, 2010, because she believed Z.M.A. had a fever. The doctor's examination noted that Z.M.A. did not have a fever and that his ear infection was improving.

¶ 61       At the custody trial, Amabile said respondent is in need of serious intervention and recommended she seek counseling with a professional familiar with the process of alienation. Amabile also recommended the court appoint a parenting coordinator to help the parties start communicating with each other and someone to monitor the family to ensure that the process

of alienation diminishes. Amabile further recommended specific court orders that address visitation times and phone contact. Amabile acknowledged that she had concerns as to whether respondent would follow court directives. She also acknowledged that respondent tried to manipulate the court system. We recount some additional court filings by respondent below.

¶ 62 A complaint for intentional infliction of emotional distress was filed against D.T.'s girlfriend, Gabrielle Union, by Z.B.D. and Z.M.A. through respondent on April 30, 2010. The complaint sought money damages in excess of $50,000 and alleged that Union caused emotional distress to the children and Z.B.D.'s schoolwork to suffer. The complaint also alleged that Z.B.D. was anxious, sad and fearful of D.T., and that Z.M.A. was suffering from rejection.

¶ 63 Union filed a motion to dismiss. A response to the motion was filed by Z.B.D. and Z.M.A. through respondent. Attached to the response was an affidavit from Z.B.D. In the affidavit, Z.B.D. averred that he was eight years old, that he wrote in a journal and that the journal was attached to the affidavit. Z.B.D. signed the affidavit. Respondent said she read the affidavit and was present when Z.B.D. signed it.

¶ 64 At the custody trial, respondent testified that she gave Z.B.D.'s journal to an attorney she hired to file the lawsuit against Union. Respondent said she authorized the attorney to use the journal in the proceeding against Union and that she believed the attorney had used the journal. Respondent said she believed she was protecting Z.B.D. by giving his journal to the attorney and authorizing the attorney to use it in the proceeding against Union. The lawsuit against Union was ultimately dismissed for lack of jurisdiction.

¶ 65 Doctor Amabile testified at the custody trial that respondent's decision to give Z.B.D.'s journal to the attorney was a negative decision in regard to the best interest of the children. Amabile said that she was not aware that Z.B.D. had suffered in his schoolwork or that he was fearful of seeing D.T. Amabile said that when she interviewed Z.B.D., he was not afraid of seeing D.T. Amabile said she did not see the affidavit signed by Z.B.D. before the custody trial. She acknowledged that Z.B.D. was being used by respondent for litigation purposes.

¶ 66 A complaint for malpractice was filed on May 4, 2010, by Z.B.D. and Z.M.A. through respondent against Barclay, the children's representative. Doctor Amabile testified at the custody trial that she could not recall another custody case where the children filed an action against their representative. Amabile said she knew of no reason for respondent to sue Barclay for malpractice except to intimidate him. Amabile said that in her opinion, Barclay was competent and had the children's best interests in mind.

¶ 67 Respondent filed a complaint against D.T. for intentional infliction of mental distress on May 11, 2010. Doctor Amabile was not aware of this lawsuit before the custody trial. Respondent testified at the custody trial that she filed the lawsuit against D.T. to protect the children. At the time of the custody trial this lawsuit had been dismissed but respondent was seeking to vacate the dismissal.

¶ 68 At the custody trial, Doctor Amabile testified that she conducted her interviews with Z.B.D. in February and March 2010. Amabile said Z.B.D.'s alienation from D.T. was mild at that time but by the time her May 6, 2010, and July 26, 2010, reports were filed, Z.B.D.'s

alienation was closer to the moderate range. Amabile explained that the moderate range involves volitional conduct on the part of the alienating parent, in this case respondent. Amabile testified that at the time of the custody trial respondent's alienating behavior was beyond the moderate range and entering into the severe range. Amabile said that severe alienation involves behavior that is relentless on the part of the alienating parent. She said Z.B.D. is not severely alienated from D.T. because Z.B.D. still maintains positive feelings toward D.T. Amabile also said that both parties contributed to this unfortunate custody battle.

¶ 69    D.T. testified and was cross-examined about his June 2010 renewal of his contract with the Miami Heat and his schedule as a professional basketball player. The basketball season begins with training camp each year in late September, which is followed by preseason games. The regular season begins at the end of October and ends in April. The season consists of 82 games of which 41 are played at home (Miami) and 41 are played away. For home games, most of which are played at night, D.T. is required to be at the arena by 6 p.m. and does not return home until about midnight. There is also a "shoot around" at 10 a.m. on the day of a home game. For away games, D.T. typically travels the day before the game and almost always travels back to Miami immediately after the game unless there is another away game on the following day. D.T. said he rarely has two days off in a row during the regular season. The postseason begins in early May and, depending on the team's performance, may last until June. The postseason also involves away games.

¶ 70    D.T. also testified to the efforts he made to research schools for the children in Miami and the support system he would have there, which included Tragil. D.T. said that the children need both of their parents in their lives. He said respondent needs to get healthy and that, once she does, he wants her to spend as much time with the children as possible. He also said he does not want to take the children away from respondent but wants to foster a relationship between the parties where they each have equal rights to the children. D.T. further said he hoped that respondent and he would be able to make decisions together and that the children can see them working together as a team. D.T. tells the children that the situation they are in is not their fault and that both parents love them dearly. He finally said that he understood that his schedule would have to change if he were awarded sole custody of the children and that the children need time, attention and support from their father.

¶ 71    After D.T. presented his case, the court questioned D.T.'s counsel whether he needed to file a petition for removal of the children from Illinois to Florida. The court pointed out that in D.T.' s petition for sole custody, he noted that he had purchased a house in Chicago but testified that he was researching schools for the children in the Miami area. The court noted that D.T.'s testimony indicated he was seeking custody in Florida but that this was not alleged in his March 29, 2010, petition for sole custody. D.T.'s counsel informed the court that he had considered the issue of whether he needed to file a petition for removal and that it was "questionable." Counsel pointed out that this case was unique because the children had always had dual residency in both Florida and Illinois and that they have resided in Illinois only during the pendency of the divorce proceeding. Counsel expressed uncertainty about whether a petition for removal was necessary given that D.T. was not seeking to remove the children from Illinois permanently but to return them to Florida. The court continued the matter for both sides to research the issue.

¶ 72 Two days later, the court again raised with D.T.'s counsel the issue of the petition for removal. After a brief colloquy, the court asked counsel to file a memorandum with the court explaining why a petition for removal was not necessary in this case. The court indicated that it would allow respondent to reply to the memorandum.

¶ 73 D.T. filed a motion for leave to file an amended petition for sole custody on November 17, 2010. D.T. alleged that because the children had dual residences in two different states, it was unnecessary for him to file a petition for removal where he was seeking to "return" the children to one state of their dual residences, not to "remove" them from the other state. Alternatively, D.T. asked for leave to amend his petition for sole custody to include a prayer for leave to "remove/return" the children from Illinois to Florida if the court found it necessary. D.T. attached to his motion an amended petition for sole custody seeking removal. Respondent objected to the motion, arguing that the court's *sua sponte* questioning of D.T.'s counsel about the issue of removal prejudiced her case. The court granted D.T. leave to amend his petition for sole custody to seek removal of the children to Florida while allowing him to preserve his claim that he was seeking to return the children to Florida.

¶ 74 On March 11, 2011, in a written order, the court awarded sole care, custody and control of the children to D.T. The court also granted D.T.'s petition for removal, awarding him primary residential custody of the children in the state of Florida. The court ordered a visitation schedule for respondent. The visitation schedule provides that respondent shall have parenting time with the children: in Miami on alternating weekends from Friday to Sunday, except certain three-day weekends; in Illinois every year during the children's spring break; in Illinois in odd-ending years for Thanksgiving; in Illinois in even-ending years during the first half of the children's winter break (to include Christmas Eve and Christmas Day) and the second half of the children's winter break (to include New Year's Eve and New Year's Day) in odd-ending years; for every Mother's Day; in Illinois for Z.B.D.'s birthday weekend in even-ending years; and in Illinois for Z.M.A.'s birthday weekend in odd-ending years. Summer parenting time was divided equally between the parties into alternating two-week blocks of time. Respondent appeals.

¶ 75 Respondent first argues on appeal that the trial court's custody decision is void and must be vacated because the court did not have subject matter jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act (Uniform Child-Custody Act) (750 ILCS 36/101 *et seq.* (West 2008)). D.T. responds that respondent may not raise this argument for the first time on appeal because she failed to raise it in the trial court.

¶ 76 "[S]ubject matter jurisdiction refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." (Internal quotation marks omitted.) *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334, 770 N.E.2d 177 (2002). The Uniform Child-Custody Act provides state trial courts with a method of resolving jurisdictional questions that arise in interstate child custody disputes. See *In re Marriage of Diaz*, 363 Ill. App. 3d 1091, 1095, 845 N.E.2d 935 (2006); 750 ILCS 36/101 *et seq.* (West 2008). Under section 201(a)(1) of the Uniform Child-Custody Act, an Illinois court will have subject matter jurisdiction to make an initial child custody determination only if:

"[T]his State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State[.]" 750 ILCS 36/201(a)(1) (West 2008).

¶ 77    In determining whether a state has subject matter jurisdiction, the Uniform Child-Custody Act gives priority to jurisdiction based on the child's home state. *Diaz*, 363 Ill. App. 3d at 1096. Section 102(7) of the Uniform Child-Custody Act defines "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." 750 ILCS 36/102(7) (West 2008).

¶ 78    Respondent argues that Illinois is not the children's home state because the children did not live in Illinois for at least six consecutive months before the commencement of the custody proceeding. Respondent points out that she moved with the children to Illinois in May 2008 and that the proceeding commenced on November 26, 2007, when D.T. filed a *praecipe* for summons in suit for a dissolution of marriage in Illinois. She also points out that D.T. filed a petition for dissolution of marriage in Illinois on May 27, 2008, less than a month after the children moved to Illinois. Respondent claims that under section 201 of the Uniform Child-Custody Act, the trial court never acquired jurisdiction of the custody matter and that its final custody judgment is therefore void.

¶ 79    We agree with respondent that, in general, lack of subject matter jurisdiction may be raised at any time, including for the first time on appeal, and that a judgment entered without subject matter jurisdiction is a nullity and void. See *In re Marriage of Jerome*, 255 Ill. App. 3d 374, 388, 625 N.E.2d 1195 (1994); *In re Marriage of Yelton*, 286 Ill. App. 3d 436, 441, 676 N.E.2d 993 (1997). However, as this court recognized in *Yelton*:

        " '[J]urisdiction of the subject matter does not mean simply jurisdiction of the particular case before the court but jurisdiction of the class of cases to which the particular case before the court belongs. [Citations.] Where the subject matter of the litigation is within the general jurisdiction of the trial court, the claim of want of jurisdiction by reason of irregularities, or exceptional or special circumstances, or because the court had no jurisdiction to render the particular judgment or order cannot be made for the first time on appeal.' " *Yelton*, 286 Ill. App. 3d at 442 (quoting *Jerome*, 255 Ill. App. 3d at 388).

¶ 80    Here, there is no dispute that dissolution proceedings are within the general jurisdiction of the circuit courts. *Yelton*, 286 Ill. App. 3d at 442. As in *Yelton* and *Jerome*, respondent's argument concerns only the circuit court's jurisdiction over this particular matter, rather than the general jurisdiction of the subject matter. In such cases, the rule is that because the parties have "adjudicated their rights before the court to a final judgment without objection to the court's right to hear the cause, the parties will be bound on appeal so far as the question of jurisdiction over the particular case is concerned." *Yelton*, 286 Ill. App. 3d at 442 (citing *Jerome*, 255 Ill. App. 3d at 388). Respondent is bound by and may not now challenge the trial court's jurisdiction to hear this case.

¶ 81    We next consider respondent's argument that the trial court's custody judgment was against the manifest weight of the evidence. In determining custody, the primary consideration is the best interest and welfare of the children involved. *Prince v. Herrera*, 261 Ill. App. 3d 606, 611, 633 N.E.2d 970 (1994). Under section 602 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/602 (West 2008)), the court is to consider "all relevant factors" including the following in determining the best interest of the children:

"(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing or repeated abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, whether directed against the child or directed against another person;

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; and

(9) whether one of the parents is a sex offender." 750 ILCS 5/602 (West 2008).

The trial court's custodial decision rests on temperaments, personalities and capabilities of the parties, and the trial judge is in the best position to evaluate these factors. *Prince*, 261 Ill. App. 3d at 612. The trial court has broad discretion in determining custody and we will not disturb that determination on appeal unless it is against the manifest weight of the evidence. *Prince*, 261 Ill. App. 3d at 612.

¶ 82    Respondent contends that of the factors set forth above, three were of primary importance in this case: (1) the interaction and interrelationship of the children with their parent or parents, their siblings and any other person who may significantly affect the children's best interests; (2) the children's adjustment to their home, school and community; and (3) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children. Respondent claims that the first two of these three factors overwhelmingly favor her, while the last factor should have been examined differently by the court. Respondent maintains that the remaining six factors were either evenly balanced in favor of each party or not relevant to the present case. We note that if the evidence before the trial court did not clearly favor either party, this court cannot say that the trial court's decision to place permanent custody of the children with one of the parents was against the manifest weight of the evidence. *Prince*, 261 Ill. App. 3d at 613.

¶ 83    Respondent argues that the children's strongest and most vital relationship is with her because she has always been their primary caretaker. The trial court found and the record shows that both D.T. and respondent love and adore the children and have a close bond with

-19-

them. Doctor Amabile testified that both D.T. and respondent identify with the parenting role, have a loving relationship with the children and exhibit wonderful interaction with each child. Amabile described both D.T. and respondent as affectionate and loving with the children and said that the children were very comfortable around both D.T. and respondent. Although respondent has been the children's primary caretaker, Amabile noted that respondent has had substantial help caring for the children. Similarly, Amabile noted that D.T. relies heavily on his sister Tragil and housekeeper Tomasa for much of the hands-on care and supervision of the children. Based on this evidence, we cannot say that the trial court's determination that both D.T. and respondent have a strong and loving relationship with the children is against the manifest weight of the evidence. See *Prince*, 261 Ill. App. 3d at 613.

¶ 84    Respondent also argues that the children are well adjusted to their home, school and community in South Holland, Illinois, and that this factor weighs in her favor. The trial court found and we agree that the children are well adjusted to their home, school and community in South Holland. The record shows the children live in a lovely gated house in South Holland, attend an excellent school where Z.B.D. is receiving good grades and participates in many community activities, including sports and summer camps. All witnesses agreed that Z.M.A. is a delightful, active and well-adjusted young boy. The trial court's finding that the children are well adjusted to their community in South Holland was not against the manifest weight of the evidence.

¶ 85    Although this factor weighs in favor of respondent, we note that Z.B.D. was equally well adjusted to his community in Miami before respondent moved the family to Illinois. The record shows that Z.B.D. lived in Miami from 2003 to May 2008, a majority of his young life. He lived in a beautiful home and attended a very good Presbyterian school in Miami. Respondent testified that she moved to Chicago to be near her mother. Aside from the fact that the children's extended family members live in Chicago, respondent failed to present evidence that Chicago offered a better life for the children than Miami.

¶ 86    Respondent claims that the two factors discussed above are either evenly balanced or weigh in her favor. We believe these two factors are evenly balanced in favor of both parties. As mentioned, if the evidence before the trial court did not clearly favor either party, this court cannot say that the trial court's decision to place permanent custody of the children with one of the parents was against the manifest weight of the evidence. *Prince*, 261 Ill. App. 3d at 613.

¶ 87    Respondent maintains that the eighth factor, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children, was the deciding factor in this case. The trial court found:

    "[Respondent] has embarked upon an unstoppable and relentless pattern of conduct for over two years to alienate the children from their father, and lacks either the ability or the willingness to facilitate, let alone encourage, a close and continuing relationship between them."

The court also found that D.T. was willing to encourage a close and continuing relationship between the children and respondent. The court concluded that "awarding sole custody to

D.T. affords the best possibility of securing the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of Z.B.D. and Z.M.A."

¶ 88 Respondent argues that in reaching this conclusion, the trial court ignored evidence of D.T.'s conduct which contributed to the alienation between the parties. Respondent claims the evidence showed that D.T. undermined her relationship with the children when he failed to tell her that Z.B.D. sustained an injury in December 2009 while playing by the pool in Miami and that D.T. was taking the children to Boston for a sporting event in the summer of 2010. She also claims that the court erred in finding that D.T. will encourage a close and continuing relationship between her and the children where the only evidence that he will do so is D.T.'s self-serving testimony that he would like respondent to spend as much time with the children as possible.

¶ 89 We disagree with respondent that the trial court ignored evidence of D.T.'s contribution to the alienation between the parties. The record shows the court took notice of D.T.'s alienating behavior when considering each party's willingness to encourage a continuing relationship between the children and the other parent. The court noted in its written order that D.T. should have told respondent about Z.B.D.'s injury and that D.T. was taking the children to Boston. The court acknowledged that D.T.'s failure to do so caused unnecessary stress for respondent. The court was also aware of Doctor Amabile's testimony that both parties contributed to this unfortunate custody battle. The court, however, could not ignore the evidence of respondent's alienating behavior when considering each party's willingness to facilitate a continuing relationship between the children and the other parent.

¶ 90 Doctor Amabile noted in her first report that she was critical of respondent's attitude on fostering a relationship between D.T. and the children before the court ordered visitation for D.T. Amabile said that respondent made visitation with the children challenging for D.T. and negatively controlled his access to the children. She also said that even after the court ordered parenting time for D.T., respondent attempted to interfere with D.T.'s relationship with the children. Amabile pointed out that respondent was controlling and resistant to authority on the issue of visitation. Amabile also pointed out that respondent does not understand how she has placed the children in the middle of the parties' divorce, how Z.B.D. has suffered because of the pressure he feels and how it is wrong for respondent to say disparaging things about D.T. to the children.

¶ 91 The record shows that on two occasions respondent sought medical care for the children just before a scheduled visit with D.T., leading to a curtailment, restriction or cancellation of D.T.'s visit. Amabile testified that taking the children to the hospital before their scheduled visit with D.T. was volitional on respondent's part and not in the best interests of the children.

¶ 92 On December 17, 2008, the court ordered parenting time for D.T. in Florida. The order directed that D.T. was to spend Christmas 2008 with the children. On Christmas morning, when D.T. was scheduled to visit with the children, respondent took the children to the emergency room. She claimed both children had a fever, a cough and did not sleep during the night. Doctor Amabile noted in her report that respondent's description of the children's

symptoms was not supported by medical evidence. Amabile questioned respondent's decision to take the children to the hospital on Christmas morning.

¶ 93    On March 12, 2010, respondent took Z.B.D. to the emergency room on the day he was scheduled to travel to Florida to visit with D.T. Respondent claimed Z.B.D. was suffering from headaches as a result of falling by a pool while in D.T.'s care. Respondent did not notify D.T. or others of Z.B.D.'s whereabouts for nearly a day. Amabile said there was no excuse for respondent's behavior and that it inflamed the circumstances of the litigation. Amabile questioned respondent's timing in seeking medical care for the children and said respondent embellished the severity of the children's symptoms, especially the extent of Z.B.D.'s pool injury.

¶ 94    Although Z.B.D. was ultimately diagnosed with a sinus infection, respondent filed a petition for an order of protection against D.T. on the basis of Z.B.D.'s pool injury. The petition alleged that Z.B.D. was suffering from headaches as a result of hitting his head and nearly drowning while he was with D.T. in Miami. Amabile noted in her first report that Z.B.D.'s head never went under water, that he did not almost drown and that respondent embellished the details of Z.B.D.'s accident. The petition did not mention that Z.B.D. was diagnosed with a sinus infection, which doctors believed was responsible for his headaches. Respondent sought a denial of D.T.'s visitation and that he have no contact with the children by any means. Respondent also filed a complaint against D.T. for intentional infliction of mental distress. She testified at the custody trial that she filed the lawsuits against D.T. to protect the children.

¶ 95    We note that as recently as December 2010, during the custody trial, respondent continued to seek medical attention for the children in lieu of D.T.'s scheduled visits. In December 2010, the court ordered parenting time for D.T. to take place in Miami from December 26, 2010, to January 2, 2010. The day before the children were scheduled to travel to Miami, respondent sent an e-mail to her attorney saying that Z.M.A. was vomiting, had trouble sleeping and was on medication. She also said that Z.M.A.'s doctor told her that if Z.M.A. developed a fever he should not travel. Z.M.A. did not go to Miami. Z.M.A.'s medical records did not support respondent's claims where he was cleared by the doctor to return to school on December 15, 2010, his medication was discontinued on December 20, 2010, and he had no fever on three separate visits to the hospital in December.

¶ 96    Aside from seeking medical care for the children, respondent also tried through pleadings to prevent D.T.'s scheduled visits through pleadings. On July 9, 2010, respondent filed an emergency motion that she be granted parenting time *instanter*. At the time, the children were with D.T. in Orlando, Florida at the Disney World Resort. Respondent alleged in her motion that she was not aware the children would be traveling across state lines, despite the fact that she had filed a *pro se* motion two months earlier asking the court to deny D.T.'s request to take the children to the Disney attractions in Orlando.

¶ 97    After the children's trip to Disney World, respondent filed an emergency motion for D.T. to have supervised visitation. The motion alleged that D.T. physically abused the children in Orlando. Respondent attached to the motion a letter from a doctor who expressed concern about the safety of the children and recommended that D.T.'s visits be supervised. After

-22-

meeting with D.T. and observing his interaction with Z.B.D., this same doctor wrote another letter to the court withdrawing his earlier letter, explaining that he had not had the other reports prepared in the case and that respondent did not give him consent to speak to anyone involved in the case. The doctor also wrote that the children were safe with D.T. Doctor Amabile testified that respondent's motion was a continued attempt to alienate the children from D.T. Amabile acknowledged that as soon as respondent received a medical assessment she believed would be sufficient to prevent D.T.'s visitations, she sought to prevent them.

¶ 98    In reviewing the propriety of the trial court's conclusion that respondent lacks the willingness to facilitate a continuing relationship between D.T. and the children, we cannot overlook Z.B.D.'s journal. Doctor Amabile described the journal as being almost exclusively about D.T. and very negative. Amabile noted that the existence of the journal and Z.B.D.'s use of words such as "abuse" and "abandoned" raised questions of the origin of the idea of writing a journal about D.T. and the source of Z.B.D.'s information about the events memorialized in it. Although respondent testified that Bocanegra recommended Z.B.D. write in the journal, respondent was impeached with evidence that the first entry in the journal predated Z.B.D.'s first meeting with Bocanegra.

¶ 99    We also cannot overlook respondent's efforts to alienate the children from D.T.'s sister, Tragil. In December 2009, respondent, Nadgee and respondent's mother prayed and made disparaging comments about Tragil in front of the children. Doctor Amabile said this behavior likely had a negative effect on Z.B.D. by alienating him from his aunt Tragil. Respondent filed a civil complaint for intentional infliction of emotional distress against Tragil. Amabile testified that the lawsuit was a "bad idea" and essentially meritless. She said it was another example of the process of alienation.

¶ 100    In the most egregious example of trying to alienate the children from Tragil and, in turn, D.T., respondent filed a criminal petition for order of protection on behalf of Z.B.D. against Tragil. The petition alleged that Tragil physically abused Z.B.D. The petition proceeded to a criminal trial against Tragil. Z.B.D. testified against Tragil at the trial. Doctor Amabile said respondent exacerbated the pressure felt by Z.B.D. Respondent testified at the custody trial that she believed the filing of the criminal case against Tragil served to foster a safe and healthy relationship between the children, Tragil and D.T.

¶ 101    D.T. on the other hand testified that the children need both of their parents in their lives. D.T. said he does not want to take the children away from respondent but wants to foster a relationship between the parties where they each have equal rights to the children. He also said that he hoped that respondent and he would be able to make decisions together and that the children may one day see them working together as a team. D.T. further said that once respondent gets healthy, he wants her to spend as much time with the children as possible. D.T. tells the children that the situation they are in is not their fault and that both parents love them dearly. He also expressed frustration with being estranged from respondent's mother, Darlene, during the divorce proceeding. He said he would like to reconcile with Darlene and foster a relationship between her and the children.

¶ 102    The trial court had the opportunity to evaluate the credibility, temperaments, personalities and capabilities of both D.T. and respondent and to determine what weight to place on the

testimony of the witnesses. *Prince*, 261 Ill. App. 3d at 616. One of the underlying purposes of the Marriage Act is to "secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation." 750 ILCS 5/102(7) (West 2008). The trial court found that D.T. was willing to encourage a close and continuing relationship between the children and respondent and that awarding sole custody of the children to D.T. "affords the best possibility of securing the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of Z.B.D. and Z.M.A." Based on the evidence presented, we cannot say the trial court's decision was against the manifest weight of the evidence.

¶ 103    We are unpersuaded by respondent's argument that before awarding sole custody to D.T., the court should have provided her with an opportunity to avail herself of professional help to change her alienating behavior as recommended by Doctor Amabile. In support of this argument respondent relies on *In re Marriage of Bates*, 212 Ill. 2d 489, 819 N.E.2d 714 (2004), and *In re Marriage of Divelbiss*, 308 Ill. App. 3d 198, 719 N.E.2d 375 (1999). Respondent points out that in the May 6, 2010, report, Amabile recommended joint custody with respondent as the primary residential parent and advised respondent to seek counseling with the goal of helping her learn to support the children's relationship with D.T. In her July 26, 2010, report, Amabile concluded that sole custody should be awarded to respondent and recommended: respondent seek counseling with a professional who is familiar with the process of alienation; the court appoint a parenting coordinator to help the parties start communicating with each other and someone to monitor the family to ensure that the process of alienation is diminishing; and specific court orders that address visitation times and phone contact.

¶ 104    We note that Doctor Amabile's recommendations are not controlling. *Prince*, 261 Ill. App. 3d at 615. A recommendation concerning the custody of a child is just that, a recommendation. *Prince*, 261 Ill. App. 3d at 615-16 (citing *In re Marriage of Felson*, 171 Ill. App. 3d 923, 525 N.E.2d 1103 (1988)). A trial court is free to evaluate the evidence presented and accept or reject the recommendation in whole or in part. *Prince*, 261 Ill. App. 3d at 616. Just because a trial court followed an expert's recommendations in *Bates* and *Divelbiss* does not mean the same result should necessarily follow in this case. This is especially so where, as here, Amabile: was not aware of certain instances of alienation on respondent's part at the time she filed her reports and recommendations; noted that sole custody with respondent was a less desirable arrangement than joint custody because of the risk that respondent would abuse her authority and continue to alienate the children from D.T.; expressed concerns as to whether respondent would follow court directives; acknowledged that respondent tried to manipulate the court system; and testified at the custody trial that respondent's alienating behavior had progressed beyond the moderate range and was entering the severe range.

¶ 105    Contrary to respondent's argument, the record shows that her alienating behavior worsened during the two-year course of the custody proceeding. The record also shows that respondent had ample opportunity to comply with Doctor Amabile's recommendations to seek counseling but failed to do so. Although respondent's counsel had reported to Amabile

that respondent had started individual therapy with a psychologist in June 2010, respondent testified at the custody trial that she was no longer seeing the psychologist. Respondent said she was seeing a psychiatrist but did not say when she started seeing or when she last met with the psychiatrist. The record further shows that during the course of the proceeding, the court on several occasions admonished respondent about her pattern of behavior and her unwillingness to obey court orders that were not in her favor. Respondent ignored the court's admonishments and her failure to follow the court's directives ultimately resulted in the issuance of a body attachment and $10,000 cash bond for her. Given this record, we cannot say the trial court erred in rejecting Amabile's recommendations and awarding sole custody of the children to D.T.

¶ 106    Respondent finally contends the trial court committed reversible error in ruling on the issue of the children's removal from Illinois to Florida. Respondent claims the court erred in prompting and allowing D.T. to file a petition for removal after he had rested his case. In the alternative, respondent maintains the court erred in granting D.T.'s petition.

¶ 107    Section 2-616 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-616 (West 2008)) addresses amendments to pleadings and provides:

"(a) At any time before final judgment amendments may be allowed on just and reasonable terms, *** adding new causes of action *** in any matter, either form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought ***.

***

(c) A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2-616(a), (c) (West 2008).

The four factors to consider when determining whether a pleading may be amended include: (1) whether the proposed amendment would cure the defective pleading; (2) whether the other party would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether the moving party had previous opportunities to amend the pleading. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273, 586 N.E.2d 1211 (1992). A trial court's ruling granting an amendment to a pleading is reviewed for an abuse of discretion. *Loyola Academy*, 146 Ill. 2d at 273.

¶ 108    Respondent concedes that the proposed amendment, the petition for removal, cured the defective pleading. She argues that the other three factors set forth above did not support the court's decision to allow the amendment. Respondent claims that: she was severely prejudiced by the amendment because she prepared for a trial where the sole issue was custody, not removal; the petition for removal was not timely because D.T. knew from the start of the proceeding that he was seeking custody in Florida; and D.T. had ample opportunity to amend his pleading and in fact did amend his petition for dissolution of marriage without including a request to remove the children from Illinois.

¶ 109    Here, we cannot say that respondent was prejudiced or surprised by the amendment. D.T. testified from the beginning of the custody trial that he was seeking sole custody of the children in Florida. He testified about the efforts he made to research schools in the Miami

-25-

area and the support system he would have in Miami. Respondent was well aware that D.T. worked and lived in Miami. She extensively cross-examined D.T. about his July 2010 signing of a new contract with the Miami Heat, his schedule as a professional basketball player and the amount of time he would be able to spend in Miami with the children if he were awarded sole custody.

¶ 110     We likewise cannot say that the amendment was untimely. As mentioned, an amendment may be allowed on just and reasonable terms at any time before a final judgment is entered. See 735 ILCS 5/2-616(a) (West 2008). Here, the court allowed the amendment before the custody judgment was entered.

¶ 111     Although we agree with respondent that D.T. had earlier opportunities to amend and seek removal, we find no error with the court's decision allowing him to file the amendment at the end of his case. The record shows that the family had dual residences in both Illinois and Florida and that the children spent time in both states. The record also shows that shortly after D.T. filed a petition for dissolution of marriage, respondent moved with the children from Florida to Illinois. D.T.'s counsel told the court that he did not file a petition for removal because D.T. was not seeking to remove the children from Illinois but, rather, to "return" them to Florida. The court continued the matter for both parties to research the issue. When the case was recalled, the court noted it found no case law to support the concept of dual residency in the context of a child custody proceeding. The court ultimately allowed D.T. to file the amendment while also preserving his claim that he was seeking to return the children to Florida. We believe the court properly allowed the amendment to conform the pleadings to the proofs. 735 ILCS 5/2-616(c) (West 2008).

¶ 112     Respondent argues that even if the court properly allowed D.T. to amend his pleading and file a petition for removal, it erred in granting it. Section 609 of the Marriage Act (750 ILCS 5/609 (West 2008)) governs petitions for removal. *In re Marriage of Eckert*, 119 Ill. 2d 316, 324, 518 N.E.2d 1041 (1988). Section 609(a) provides:

"The court may grant leave, before or after judgment, to any party having custody of any minor *** children to remove such *** children from Illinois whenever such approval is in the best interests of such *** children. The burden of proving that such removal is in the best interests of such *** children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2008).

¶ 113     Respondent argues that D.T. did not meet his burden of proof that removal is in the best interests of the children. She claims that D.T. did not present sufficient evidence for the trial court to determine whether removal is in the best interests of the children where he did not seek removal until after he had rested his case. Respondent maintains that the court heard virtually no evidence to support removal of the children from Illinois and based its decision solely on evidence related to the custody case.

¶ 114     In *Eckert*, our supreme court emphasized that the best interests of the children is the "paramount question" that must be considered in removal actions. *Eckert*, 119 Ill. 2d at 325. A best interests determination "cannot be reduced to a simple bright-line test," but "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Eckert*, 119 Ill. 2d at 326. The *Eckert* court suggested several factors the trial court

should consider in granting removal: (1) the likelihood that the proposed move would enhance the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking removal or whether removal is merely a ruse intended to defeat or frustrate visitation; (3) the motives of the non-custodial parent in resisting the removal; (4) the visitation rights of the non-custodial parent; *i.e.*, whether a realistic and reasonable visitation schedule can be reached if the move is allowed; and (5) whether potential harm may result to the children from removal. *Eckert*, 119 Ill. 2d at 326-28.

¶ 115 The *Eckert* factors do not to establish a test in which the parent seeking removal must meet every prong but, rather, they are to be considered and balanced by the trial court in arriving at a best-interests determination. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 523, 791 N.E.2d 532 (2003). In determining the best interests of the children in a removal action, the *Eckert* factors are not exclusive and no one factor is controlling. *In re Marriage of Smith*, 172 Ill. 2d 312, 321, 665 N.E.2d 1209 (1996); *Collingbourne*, 204 Ill. 2d at 523. A trial court may validly consider other relevant factors as dictated by the specific circumstances of each case in arriving at a best-interests determination. *Collingbourne*, 204 Ill. 2d at 523.

¶ 116 A trial court's determination of what is in the best interests of the children will not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Collingbourne*, 204 Ill. 2d at 521-22 (citing *Eckert*, 119 Ill. 2d at 328). There is a strong and compelling presumption in favor of the result reached by the trial court in a removal case. *Eckert*, 119 Ill. 2d at 330.

¶ 117 Respondent asserts that while D.T. presented evidence on the issue of sole custody, he did not present evidence showing: how removal of the children to Florida was in the children's best interests; how the move would enhance the general quality of their lives; or what a realistic and reasonable visitation schedule for the children and respondent would be if the children moved to Florida. Respondent also asserts that the court did not adequately consider the potential harm to the children resulting from the move.

¶ 118 Here, the trial court conducted a thorough 38-day trial. It heard extensive testimony and issued a 102-page written order in which it applied the *Eckert* factors to the facts presented and concluded that, after "weighing all relevant factors and considering that a removal decision should be guided by the policy of the [Marriage Act]," removal was in the children's bests interests. We cannot say that the court's ruling was against the manifest weight of the evidence. See *Collingbourne*, 204 Ill. 2d at 524.

¶ 119 With respect to the first *Eckert* factor, the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children, the trial court found that the initial disruption caused by the move would be outweighed by the long-term benefits of the children moving to Florida. The court acknowledged that by allowing removal, the children would leave their friends and be separated from respondent and their extended family in Illinois. However, the court noted that by allowing D.T. to remove the children to Florida, the quality of their life will be enhanced because they will no longer have to travel by airplane to visit with D.T.; will not be subject to the stress, confusion and trauma that has

become the norm when visiting with D.T.; and will be afforded the benefit of having two loving and committed parents and two loving and committed extended families continually in their lives as evidenced by D.T.'s testimony that he wished to foster a relationship between the children, respondent and respondent's mother.

¶ 120    We note that removal of the children to Florida would also enhance the quality of D.T.'s life. *Collingbourne*, 204 Ill. 2d at 525. The record shows that D.T. lives in Florida and is a successful professional basketball player. Although he has a demanding schedule and must travel with the team, the record shows that he is in Miami frequently, which includes a combination of after school time, breakfast time, dinnertime and bedtime. This is in contrast to the situation in Illinois, where D.T. had almost no contact with the children. D.T. testified that he will make the time to be with the children. Doctor Amabile noted in her first report that in Miami, D.T. made an effort to be a good father to the children despite his busy basketball schedule. We believe the court properly applied the first *Eckert* factor to the evidence presented and that this factor weighs in favor of removal.

¶ 121    The second *Eckert* factor requires the trial court to assess the motive of the custodial parent, D.T., in seeking removal. *Eckert*, 119 Ill. 2d at 327. The court found and we agree that D.T.'s motive was well intentioned and not a ruse intended to defeat or frustrate respondent's visitation. *Eckert*, 119 Ill. 2d at 327. As mentioned, visitation with D.T. in Illinois for the children is a burden on all the parties involved, especially the children. D.T. lives and works in Miami and renewed his contract with the Miami Heat in July 2010. The children lived in Miami from 2003 to 2008 until respondent moved with them to Illinois. The return of the children to Miami would serve their best interests because they would no longer have to travel by airplane to visit D.T. Doctor Amabile testified that traveling would become a burden for the children as they grow older and may cause resentment on their part. With the children in Miami, respondent can now travel to Miami to be with the children. D.T. can afford to pay for respondent's travel costs. The trial court did not err in assessing the second *Eckert* factor and concluding that it weighed in favor of removal.

¶ 122    As for the third *Eckert* factor, the motives of the non-custodial parent in resisting the removal, the court found respondent's motives are mixed. The court acknowledged that respondent provided a good and loving home for the children and has been actively involved in providing them good schooling in Illinois. However, the court noted that respondent's alienating behavior during the pendency of the custody proceeding progressed to what Doctor Amabile described as almost in the severe range. The court noted and we agree that respondent's attempts to alienate the children from D.T. would be thwarted if the children were removed from Illinois to Florida. The court did not err in finding that this factor also weighed in favor of removal.

¶ 123    The final two *Eckert* factors deal with the visitation rights of the non-custodial parent. Because it is in the children's best interests to have a healthy and close relationship with both parents, the trial court must carefully consider the effect the proposed removal would have on the visitation rights of the non-custodial parent. *Eckert*, 119 Ill. 2d at 327. In doing so, the trial court should assess the fourth *Eckert* factor: whether, under the facts and circumstances of a given case, a realistic and reasonable visitation schedule can be reached if the move is allowed. *Eckert*, 119 Ill. 2d at 327. If removal to a distant jurisdiction will substantially

impair the non-custodial parent's involvement with the child, the trial court should then assess the fifth *Eckert* factor, the potential harm to the child which may result from removal. *Eckert*, 119 Ill. 2d at 328.

¶ 124 Here, the trial court found that D.T. ensured that respondent's visitation rights will not be obstructed in any way and that a reasonable visitation schedule can be reached. D.T. consistently acknowledged that respondent is a good mother and has a strong bond with the children. He said he wants both parents in the children's lives and the children to see their parents working together as a team. He also said he would like to reconcile with respondent's mother and foster a relationship between her and the children. Respondent testified that if D.T. is awarded sole custody she may move to Miami to be closer to the children. D.T. testified that, if respondent were to move back to Miami, he would be open to liberal visitation.

¶ 125 Even if respondent does not move back to Miami, the record shows a realistic and reasonable visitation schedule was ordered by the court. Under the schedule, respondent will have parenting time with the children in Miami on alternating weekends. As mentioned, there is no reason respondent cannot travel to Miami every other weekend to spend time with the children. Respondent is not employed, does not attend school and has no other obligation preventing her from traveling to Miami. D.T. can afford to pay for respondent's transportation costs. Under the schedule, respondent will also have parenting time with the children in Illinois every year for Mother's Day and the children's spring break. Winter breaks are divided between the parties with respondent having parenting time in Illinois during the first half of the children's break in even-ending years and the second half during odd-ending years. Summer parenting time is divided equally between the parties into alternating two-week blocks of time. While we are mindful that this schedule allows respondent less frequent visits with the children, we note that " '[c]lose relationships can continue and even be enhanced when effort is expended to establish a reasonable visitation schedule.' " *Collingbourne*, 204 Ill. 2d at 533 (quoting *In re Marriage of Ludwinski*, 312 Ill. App. 3d 495, 504-05, 727 N.E.2d 419 (2000)). Under the facts of this case, we cannot say the trial court erred in ordering the visitation schedule.

¶ 126 The trial court did not and, we believe, was not obligated to consider the fifth *Eckert* factor–the potential harm to the children resulting from the move–where the court did not conclude that the removal will substantially impair respondent's involvement with the children and where a reasonable visitation schedule for respondent was reached. See *Eckert*, 119 Ill. 2d at 328.

¶ 127 We are unpersuaded by respondent's argument that, in reaching its removal decision, the court erred in considering factors that are inapplicable to a removal determination: namely, respondent's alienating behavior and the willingness of each parent to facilitate a continuing relationship between the other parent and the children. As mentioned, in the determination of the best interests of the children in a removal action, the *Eckert* factors are not exclusive and a trial court may validly consider other relevant factors, as dictated by the specific circumstances of each case, in arriving at a best interests determination. *Collingbourne*, 204 Ill. 2d at 523. More importantly, a trial court's examination of a removal petition must be guided by the policies of the Marriage Act, one of which is to " 'secure the maximum

involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation.' " *Eckert*, 119 Ill. 2d at 328 (quoting Ill. Rev. Stat. 1987, ch. 40, ¶ 102(7), now 750 ILCS 5/102(7) (West 2008)). This policy is " 'best served when, in addition to a favorable determination of all of the *Eckert* factors, the court considers the aspects of cooperation of both parents in achieving as reasonable an expectation of normalcy and family life for the [children] involved as can be achieved following a divorce.' " *Collingbourne*, 204 Ill. 2d at 535 (quoting *In re Marriage of Roppo*, 225 Ill. App. 3d 721, 732, 587 N.E.2d 1031 (1991)).

¶ 128    In removal actions, the best interests of the children are controlling. *Eckert*, 119 Ill. 2d at 325. Under the facts presented, the trial court's determination that removal was in the best interests of the children was not against the manifest weight of the evidence.

¶ 129    The trial court's decision awarding custody of the children to D.T. and granting his petition to remove them from Illinois to Florida is affirmed.

¶ 130    Affirmed.